# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA



Case No. _____

JERRY GUSTIN and ELDA GARCIA,
individually and in their representative
capacity for all those similarly
situated,

6:08-cv-57-ORL-22DAB

                Plaintiffs,

v.

PAUL A. HOFFMAN, EDWARD S. DIGGES,
JR., and KATHERINE KERR,

                Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs Jerry Gustin, Emile LeBoulluec, and Elda Garcia, individually and in their

representative capacity for all those similarly situated, sue Defendants Paul Hoffman ("Hoffman,")

and Edward J. Digges ("Digges")(Digges and Hoffman are referred to collectively as the "Fraud

Defendants"), and Katherine E. Kerr ("Kerr").

### INTRODUCTION

1.     Plaintiffs bring this action against the Fraud Defendants for their violations of

Sections 10(b) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), and against

Defendants Kerr and Hoffman for fraudulent transfer under Florida Statutes Chapter 726. Plaintiffs'

claims arise from a fraudulent scheme perpetrated by the Fraud Defendants by which hundreds of

investors were defrauded out of approximately $22 million through investments in a group of

corporate entities that Defendants owned or controlled.

2.      Specifically, Defendants used the following entities to defraud investors: Nexstar Communications, LLC ("Nexstar"), TMT Equipment Company, LLC; TMT Management Group, LLC ("TMT Management"); POSA, LLC ("POSA"), POSA TMT, Camtucket LLC, LLC ("POSA TMT"); Televest Communications, LLC; TMT International, LLC, Televest Group, LLC; KBK Partnership LLP; Chilham LLC; and Spin Drift, LLC (collectively the "Defendants' Entities").

3.      Most of the Defendants' Entities are currently in receivership as a result of an action brought by the Securities and Exchange Commission on February 2, 2006, in the United States District Court for the Middle District of Florida, *SEC v. Digges, et al.*, Case No. 6:06-cv-137-Orl-19KRS (the "SEC Action"). *See* Order Granting Permanent Injunction, Freezing Assets, Appointing a Receiver and Ordering Other Ancillary Relief, SEC Action, (the "Order Appointing Receiver," [D.E. 15][1]). With the filing of the SEC Action, the Securities and Exchange Commission ("SEC") exposed the Defendants' Entities' fraud. On that day, the SEC filed a Complaint for Emergency Injunctive and Other Relief (the "SEC Complaint," SEC Action, D.E. 1), and the Court entered an Order granting the relief sought by the SEC Complaint. *See* SEC Action D.E. 7.

4.      It was only with the filing of the SEC Complaint that Plaintiffs and the Class became aware of the Defendants' Entities' fraud and uncovered the Fraud Defendants' role in perpetrating an investment fraud.

5.      The Order Appointing Receiver appointed James D. Silver, Esq. (the "Receiver") as the receiver of the most of the Defendants' Entities. While Plaintiffs are technically creditors of the Receivership estate, notwithstanding the Receiver's diligent efforts, it is unlikely that Plaintiffs will receive more than a small fraction of the losses they suffered at the hands of the Defendants through

---

[1] Documents filed in the SEC Action shall be identified as follows: "SEC Action, D.E. *x*," where *x* is the docket entry number with respect to the SEC Action.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

the Defendants' Entities' claims process. Consequently, this lawsuit seeks to recover Plaintiffs' losses directly from those who controlled the Defendants' Entities–the Fraud Defendants–and those who received investor funds via fraudulent transfers designed to hinder the investors' ability to recover their losses.

6.     The two Fraud Defendants have been long time business associates and personal friends. Defendant Hoffman was the best man in Defendant Digges's wedding to Defendant Kerr. Defendant Hoffman had a relatively distinguished reputation as a businessman for being, among other things, the Chairman and CEO of Ringler Associates, one of the nation's largest structured settlement firms. Digges, on the other hand, was a disbarred attorney who had served time in jail for committing fraud. According to Defendant Hoffman, in the past he had lost significant sums of money in business enterprises with Defendant Digges.  The business enterprise the Fraud Defendants' conducted through the Defendants' Entities was supposed to essentially pay back Defendant Hoffman for all of those losses. Unfortunately, the Fraud Defendants ran the Defendants' Entities as a Ponzi scheme that bilked investors of some $22 million.

7.     Because the Fraud Defendants well understood that investors could be scared away from investing in the Defendants' Entities if they knew about the role of Defendant Digges, the Fraud Defendants actively concealed Defendant Digges's role and made Defendant Hoffman the figurehead for the enterprise. As a result, investors, brokers, and even government regulators were under the impression that Defendant Hoffman was at the helm of the Defendants' Entities when, instead, it was Defendant Digges who played the most active leadership role. As a result, the Fraud Defendants were able to amass millions in investments and skim millions for themselves and their family members.

3

8.     The nature of the fraud was as follows. Between April 2003 through February 2006, the Fraud Defendants and the Defendants' Entities fraudulently sold securities in the form of investments in "point-of-sale" ATM terminals coupled with lease agreements. The terminals were supposed to be, and sometimes actually were, placed at retail establishments, and were used by merchants to provide customers with funds from customer credit, debit, and ATM or gift cards. The terminals were sold to investors by an entity controlled by the Fraud Defendants and leased back from the investors by another entity controlled by the Fraud Defendants. The investors were promised a fixed rate of return equivalent to 12 percent per year.

9.     The Defendants' Entities, controlled by the Fraud Defendants, had been selling the terminals for $5,000 each, promising to pay the investors a 12 percent annual return for five years and offering to repurchase the terminals for the full $5,000 purchase price after five years. The Defendants' Entities raised some $22 million from approximately 300 investors, many of whom are elderly. The Fraud Defendants misrepresented that the lease payments are "assured," in part through a "reserve fund" that purportedly covers six months' worth of the monthly lease obligations. The Defendants' Entities also misrepresented that the program maintained a "sinking fund" to fund the eventual repurchase of the terminals. In addition, the Fraud Defendants concealed the role of Fraud Defendant Digges (a felon and disbarred attorney who had been convicted of fraudulent billing practices) in the ownership and control of the Defendants' Entities and, instead, touted Defendant Hoffman as the sole controller of the Defendants' Entities.

10.     In fact, the Fraud Defendants' program did not maintain any "sinking fund" or "reserve fund." Since June 2005, the Fraud Defendants' scheme ran a substantial monthly deficit.

4

The Defendants' Entities contracting with investors did not have assets with which to repurchase the terminals at the end of the five year period.

11.     The Fraud Defendants also failed to disclose that, since April 2003, three state securities commissions issued orders finding that one or more of the Defendants' Entities violated state securities laws by offering the same securities at issue in this matter.

12.     During the course of the fraud, the Defendants' Entities sold the terminals through one or more of the following entities that they controlled or owned: Nexstar Communications, LLC, TMT Management Group, LLC, and TMT Equipment Company, LLC, and leased the terminals back through POSA, LLC and POSA TMT, LLC, which they also owned or controlled.

13.     One or more of the Defendants' Entities were used to funnel investor funds to Defendant Kerr (the wife of Fraud Defendant Digges) to avoid making those funds available to the defrauded investor creditors of the Defendants' Entities.

14.     By virtue of this conduct, the Defendants' Entities violated Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, making the Fraud Defendants liable as control persons of the Defendants' Entities and Defendants Kerr and Hoffman are liable for fraudulent transfer under Florida Statutes, Chapter 726.

## PARTIES

15.     Plaintiff Gerry Gustin is a citizen of the state of Texas who invested approximately $500,000 in the Defendants' Entities.

16.     Plaintiff Elda Garcia is a citizen of the state of Oklahoma who invested approximately $30,000 in the Defendants' Entities.

5

17.    Defendants Hoffman and Digges controlled of the Defendants' Entities. Various promotional materials represented that Defendant Hoffman controlled various of the Defendants' Entities as an executive officer. In fact, the Fraud Defendants both controlled those entities as owners and senior officers. Defendant Digges is a resident of Maryland and Defendant Hoffman is a resident of New York.

18.    Defendant Kerr is a Maryland resident and the wife of Digges. She received at least $1 million in transfers from the Defendants' Entities, which had the intended and actual effect of hindering the investors' claims against the Fraud Defendants and the Defendants' Entities. Defendant Hoffman received at least $625,000 in transfers from the Defendants' Entities which had the intended and actual effect of hindering the investors' claims against the Fraud Defendants and the Defendants' Entities.

19.    Defendants Digges, Kerr and the Defendants' Entities are named as Defendants in the SEC Action.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b).

21.    This Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida because: a) Defendants have engaged in significant business in Orange County, Florida; b) Defendants' wrongful conduct occurred in significant part in Orange County, Florida and Defendants Hoffman and Kerr and the Defendants' Entities are currently defendants in the SEC Action in the Middle District of Florida.

6

22.     Venue is also proper in this district pursuant to 28 U.S.C. §1391© because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in and/or originated from the Middle District of Florida and, as set forth in the preceding paragraph, Hoffman is subject to personal jurisdiction in this district.

23.     Further, Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts, practices and courses of business set forth in this Complaint.

## GENERAL ALLEGATIONS

### The Defendants' Entities' Business Scheme

24.     From at least April 2003 through February 2006, the Defendants' Entities sold more than $22 million in investments in point-of-sale terminals to approximately 300 investors throughout the United States.

25.     Point-of-sale terminals were instruments typically placed at retail establishments, which merchants used to swipe customer credit, debit, ATM, or gift cards. The terminals verified whether a customer had sufficient available credit or funds to make a particular purchase.

26.     The Fraud Defendants' investments were marketed to investors, including Plaintiffs, through brokers who were provided investment promotional literature. The Fraud Defendants brandished the name of Defendant Hoffman on their promotional literature in order to provide credibility to the brokers and investors. And brokers and investors did in fact rely on the affiliation of Defendant Hoffman with the Defendants' Entities in promoting and purchasing the Fraud Defendants' investments.

7

27.     The investments were structured so that an investor purchased terminals from one of the Defendants' Entities for $5,000 and simultaneously entered into a leaseback agreement with another of Defendants' Entities.

28.     Under the leaseback agreement, the investors received monthly lease payments of $50 per terminal purchased, representing a 12% annual return, for five years.

29.     The Fraud Defendants represented that lease payments came from revenues generated whenever merchants used the terminals.   The lease payment to the particular investor was purportedly paid from the revenues of the leasing entity, and did not depend upon the performance of a particular terminal.  For example, Nexstar's literature represented that, for every transaction a merchant processed through a Nexstar terminal, Nexstar would earn $.05 for every debit card transaction and $.025 for ever credit card transaction.  Investors have no role in the management of their terminal. All managerial and functional responsibilities were handled by the entity leasing the terminal from the investors or others acting at the entity's behest.

30.     The lease arrangement obligated the Defendant's Entity leasing the terminal to repurchase the terminal for $5,000 at the end of the lease.  Under the various lease agreements, investors also had the right to have their terminals repurchased prior to the expiration of the five year lease terms.  A number of investors actually sought to exercise their right to sell their terminals pursuant to these provisions; however, with respect to many of these investors, the Defendants' Entities did not fulfill its obligation to repurchase the terminals.

31.     Fraud Defendants had been selling these investments through a network of sales agents–principally insurance agents, financial planners, and certified public accountants–that

8

stretched throughout the United States, but was concentrated primarily in Texas, California, Michigan, and Florida.

32.     That network was structured like a pyramid, with sales agents who sold the Fraud Defendants' investments directly to investors and other sales agents who had developed their own "downstream" network of sales agents.

33.     Investors in the Fraud Defendants' program paid total sales commissions ranging from 12 to 18 percent of their total investment, which was then apportioned as compensation to sales agents "upstream" through the network.

34.     Between April 2003 and December 2003, the Fraud Defendants offered and sold the terminals through Nexstar, and used POSA to lease the terminals back from investors.

35.     During this period, investors were required to purchase a minimum of two terminals for $5,000 each.

36.     Upon payment of the funds, investors entered into three agreements: (i) a terminal purchase agreement between the investor and Nexstar; (ii) a lease agreement between the investor and POSA, requiring POSA to pay the investor $50 per month per terminal in exchange for placing, operating, and maintaining the terminal in a retail store; and (iii) an "option to sell agreement" that gave the investor the option to require POSA at the end of five years to repurchase the terminal from the investor for its full original purchase price of $5,000.

37.     Investors were given the option, and provided the forms, to purchase terminals in an Individual Retirement Account ("IRA") and, in the event this option was chosen, referred to a third party IRA administrator located in California to service their account.

9

38.     Although investors also technically were given the option to buy and operate the terminals themselves, all of the investors leased the terminals to POSA in exchange for monthly lease payments.

39.     To promote sales of their investment program, the Fraud Defendants had marketing materials prepared that described the terminals and their program and arranged for presentations to sales agents at Nexstar's offices in Orlando, Florida.  The Fraud Defendants placed other marketing materials on a website.

40.     The Fraud Defendants also prepared and filed disclosure statements with the Federal Trade Commission ("FTC") and various state agencies.

41.     Along with their marketing materials, those disclosure statements, or portions of them, were provided to sales agents for their training and eventually used as promotional materials for investors.  Those statements represented, among other things, that Defendant Hoffman was Chairman and/or CEO of two of the Defendants' Entities that marketed to and received funds from investors, Nexstar Communications, LLC and TMT Management.

42.     On November 17, 2003, the state securities commissions of Maryland and Pennsylvania issued against Nexstar and POSA Summary Orders to Cease and Desist ("Summary Orders") from offering and selling terminal investments in those respective states.  From that point, in an attempt to avoid the technical restrictions of the Summary Orders, but certainly in violation of the spirit of those orders, the Fraud Defendants marketed the Defendants' Entities investments primarily from Florida.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

43.     Thereafter through the present, the Fraud Defendants continued to offer the same investment product, but began using TMT Management and later TMT Equipment to sell the terminals, and POSA TMT to leaseback the terminals from investors.

44.     When the Fraud Defendants began selling terminals through TMT Management and TMT Equipment, they used Spin Drift and Televest Group to transfer funds among the various Defendants' Entities.

45.     The Fraud Defendants also used Televest Group to fund lease payments to the investors and used Spin Drift to repurchase terminals from certain investors.

46.     Despite using different entities, the Defendants' Entities' investment program remained essentially unchanged, except that the Defendants' Entities increased the minimum investment from two terminals to five.

### Defendant Hoffman's Ownership and Control over the Defendants' Entities

47.     Defendant Hoffman testified that, prior to his involvement with the Defendants' Entities, Hoffman repeatedly lost money with respect to his business ventures with Defendant Digges.  With the Defendants' Entities, Hoffman was supposed to finally recoup those losses. Unfortunately, Hoffman's recoupment was to be accomplished through fraud.

48.     The Fraud Defendants were essentially 50-50 partners in the Defendants' Entities. Through a web of companies, the Fraud Defendants owned and controlled the Defendants' Entities. Because Digges was a convicted felon, it would have been unwise to mention Digges's role in the ownership and management of the Defendants Entities. Hoffman, on the other hand, had a relatively distinguished reputation as a businessman.  Consequently, the Fraud Defendants represented to

11

investors and brokers that Hoffman was the person in charge of the Defendants' Entities, and concealed from investors the role that Digges played in management.

49.    Defendant Digges entered into a settlement with the Securities and Exchange Commission and the Receiver in connection with his ownership and control of the Defendants' Entities which acknowledges Digges's involvement in the management of the Defendants' Entities.

50.    Defendant Hoffman claims that he was not involved in the management of the Defendants' Entities but was merely a passive investor. However, contrary to his claims, Hoffman: (i) was involved in and profited from the management of the Defendants' Entities, (ii) was well aware, or should have been aware, that the Defendants' Entities were committing securities fraud with their investment products; and (iii) was in a position to stop the wrongful conduct being committed by the Defendants' Entities.

51.    Indeed, Hoffman not only allowed the Defendants' Entities to bilk investors, he was actively involved in promoting the Defendants' Entities' wrongful conduct. What follows are specific examples of Hoffman's participation in the promotion of the wrongful conduct of the Defendants' Entities that are reflected in documents.

A.    Defendant Hoffman Lured Investors

52.    Hoffman's name was listed prominently on the investment literature circulated by the Defendants' Entities. That literature represented that Hoffman was in charge of certain key Defendants' Entities. Defendant Hoffman's control of the Defendants' Entities was also touted by one or more web sites maintained by the Defendants' Entities. In addition, Hoffman's control of the Defendants' Entities was touted by direct word of mouth to brokers and investors.

12

53.    Hoffman knew that his name was being used by the Defendants' Entities to market its products to investors. Yet Hoffman took no meaningful steps to disassociate his name from the Defendants' Entities. As a result, brokers solicited and investors invested funds in the Defendants' Entities in reliance on their belief that Hoffman was at the helm of the Defendants' Entities.

B.    Defendant Hoffman Knew the Defendants' Entities Had Defrauded Investors

54.    Hoffman was not only aware that his name was being used by the Defendants' Entities to market to investors, he also knew or should have known that the Defendants' Entities were perpetrating a fraud. One reason Hoffman knew or should have known about the wrongful conduct of the Defendants' Entities is that he knew that Digges was convicted of, and had served time in jail for, fraud.

55.    Defendant Hoffman also had direct knowledge that the Defendants' Entities could not deliver on the promises they made to investors. For example, Hoffman negotiated directly with a disgruntled investor of Nexstar Communications, LLC. The investor had claimed that he had been defrauded and Hoffman communicated with the investor and arranged for a refund of his investment into Nexstar Communications, LLC, in order to "get rid of him" as a "problem" for the Defendants' Entities.

56.    Hoffman received notice that two of the Defendants' Entities, Nexstar, POSA and Hoffman, himself, were cited by the Pennsylvania authorities for violating that state's securities laws. That same notice identified Hoffman as the "CEO" of Nexstar and POSA. In settling the charges brought by the Pennsylvania authorities, Hoffman consented to the finding that he was chairman and CEO of Nexstar and purported president of POSA.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

57.     Defendants' Entity TMT International LLC ("TMT International") was an entity owned and controlled by the Fraud Defendants. Hoffman established a bank account for TMT International and in setting up the account, he listed himself as "CEO" of TMT International with the understanding that the entity was created as an additional vehicle to market the Fraud Defendants' investments overseas.

58.     The internal written correspondence of the Defendants' Entities indicate that Hoffman was involved in, and certainly aware of, the planning and operations of one or more of the Defendants' Entities. Those correspondence, which Hoffman himself received, repeatedly referred to Hoffman as the ultimate control person with respect to various of the Defendants' Entities.

C.     Defendant Hoffman Participated in the Management of the Defendants' Entities

59.     Hoffman actively engaged in the management of the Defendants' Entities by, among other things (including those activities identified above), participating in management conferences. According to a participant at one such conference, Hoffman himself suggested deepening the Defendants' Entities fraudulent conduct by using an already underfunded investor reserve fund (a fund that investors had been promised would be used to repurchase their terminals) to fund a new business enterprise.

D.     Defendant Hoffman Was Enriched by the Defendants' Entities

60.     According to his tax schedules, Hoffman received hundreds of thousands of dollars in profits as a result of his ownership interest in the Defendants' Entities. At least $625,000 of Hoffman's returns came in the form of direct cash payment.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

E.    Defendant Hoffman Had the Power to Stop the Fraud

61.    Because Hoffman, directly or indirectly, owned 50% of each of the Defendants' Entities, he had the power to, at any time, stop their fraudulent conduct.  Had Hoffman merely exercised his legal right to prevent the Defendants' Entities from engaging in conduct that defrauded investors, conduct he knew or should reasonably have known was taking place on his watch, he could have saved investors many millions of dollars.

62.    Because Hoffman owned and controlled the Defendants' Entities, he (like his cohort Digges) is liable for the misrepresentations and omissions of the Defendants' Entities.  Those misrepresentations and omissions are set forth in more detail in the following section.

## DEFENDANTS' ENTITIES' MISREPRESENTATIONS AND OMISSIONS

## Misrepresenting the Existence of a Sinking Fund to Repurchase ATM Machines

63.    The offering materials prepared by the Defendants' Entities and distributed to the sales force and investors ("Offering Materials") represented that the lease payments were "assured." In fact, the investment program ran a deficit since the inception and did not have the assets to pay the promised lease payments or to repurchase the terminals.

64.    Defendants' Entities' marketing materials represented that the obligations of POSA to pay monthly lease payments were "assured" through the creation of a "reserve fund." Specifically, the materials stated that "[t]o help insure that the monthly lease payments are available as due to our lessors, POSA maintains a six (6) month cash reserve fund for each and every lease it maintains."

65.    The Offering Materials that were distributed to the sales force and to investors represent that the lease payments to investors were "assured," in part because the Defendants' Entities maintained a "reserve fund."

15

66.     Specifically, the Offering Materials stated, "[t]o help insure that the monthly lease payments are available as due to our lessors, POSA maintains a six (6) month cash reserve fund for each and every lease it maintains."

67.     The Defendants' Entities also represented that the they maintained a "reserve fund" or "sinking fund" to assure the repurchase of terminals. For example, in or around 2003, Digges told Christopher Morris, a sales agent, that the sinking fund for terminal repurchase was maintained at Fidelity Investments and, with each terminal purchase, funded with a $1,000 contribution from the Defendants' Entities and thereafter $75 per month during the term of the five year lease.

68.     The Defendants' Entities also told a group of sales agents that the Defendants' Entities maintained a reserve fund, which was invested in federal government treasury obligations.

69.     In addition, Chris Haug, the chief financial officer of Nexstar, represented in a January 29, 2004 letter to Jack Brown, another sales agent selling Defendants' investment program, that a reserve fund would be maintained.

70.     In truth, the Defendants' Entities never established a reserve fund or sinking fund to cover the lease payments or the repurchase of terminals.

**Misrepresentations and Omissions Related to Management Experience and Integrity**

71.     Defendants' Entities' Offering Materials also touted the experience, expertise, and integrity of management, representing that, within the previous seven years, management had no criminal or civil liability involving fraud.

72.     The Offering Materials mentioned Hoffman prominently, but concealed Digges's substantial and controlling role in the program and did not disclose Digges's 1990 mail fraud conviction, which arose from client over-billing.

16

73.     Defendants' Entities' Offering Materials also failed to disclose the 1989 civil judgment against Digges for fraud, deceit, and breach of contract. That judgment ordered Defendant Digges and his law firm, jointly and severally, to pay $3,634,801.92.

74.     Nor do the Offering Materials disclose that Digges, formerly a lawyer licensed in Maryland, was disbarred following his felony conviction. Both Fraud Defendants knew of Digges's conviction.

75.     After the Summary Orders were issued, the Defendants' Entities also failed to disclose that the Fraud Defendants had been specifically cited for violating securities laws in connection with the exact same investment product they were then marketing. The Summary Order from Maryland found that the Fraud Defendants had committed fraud which, likewise, was never disclosed to investors.

### The Defendants' Entities Were Operated as a Ponzi Scheme

76.     The Defendants' Entities began operating at a deficit at or near their inception in November 2002, and the deficit widened as time progressed, reaching at least $140,000 per month by the first quarter of 2005.

77.     Those deficits arose because the revenue from terminals that were actually placed with merchants, referred to as "residual payments," were minimal compared to: (a) the lease obligations to investors; and (b) the substantial amount of investor proceeds that Defendants regularly transferred to or for the benefit of themselves or their family members.

78.     Because the Defendants' Entities that had contracted to lease and repurchase the credit card terminals from investors did not have sufficient funds to cover their obligations, the Fraud

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

Defendants operated the Defendants' Entities as a Ponzi scheme, directing the Defendants' Entities to use funds from new investors to pay the Defendants Entities' lease and repurchase obligations.

79.     Investors were never told that the Defendants' Entities operated as a Ponzi scheme.

### Defendants Concealed the State Summary Orders

80.     After December 2003, investors were not told, through the Offering Materials or otherwise, that the state securities commissions of Maryland and Pennsylvania had issued Summary Orders finding that one or more of Defendants' Entities had violated state securities laws by engaging in the offering.

81.     Investors also were not told that, in October 2004, the state securities commission of Ohio issued an order finding that one or more Defendants' Entities had violated Ohio's securities laws by engaging in the offering.

82.     The Fraud Defendants did not disclose that the Maryland Summary Order included a finding that the offering involved fraud.

### Defendants Concealed Commissions and Payments to Insiders

83.     Prospective investors also were not advised, through the Offering Materials or otherwise, of the existence or the magnitude of the sales commissions that investors were paying to sales agents on terminal investments, *i.e.*, 12 to 18 percent of their total invested funds.

84.     Defendants also were paid huge sums by the Defendants' Entities and those amounts also were not disclosed.

85.     Throughout the venture, Kerr provided no goods or services to any of the Defendants' Entities, yet she received the benefit of at least $1 million of investor funds from the Defendants' Entities.

18

86.    Defendant Hoffman received cash directly from the Defendants' Entities. Plaintiffs are aware of at least one instance when Defendant Hoffman received such a cash payment. In April 2004 Defendant Hoffman received $625,000 from the Defendants' Entities. At the time the transfer was made to Hoffman, the Defendants' Entities were completely insolvent.

## ALLEGATIONS AS TO SPECIFIC PLAINTIFFS

### Elda Garcia

87.    Plaintiff Elda Garcia is an elderly, handicapped widow, with no survivor pension benefits whatsoever, who lives in San Antonio Texas. Through a locally based investment agent, Frank Harrison (who is under indictment in Texas in connection with this very scheme), Ms. Garcia was persuaded to purchase and lease back six (6) ATM machines from the Defendants' Entities in reliance on Defendants' Entities' various misrepresentations and omissions, for a total investment of $30,000.

88.    The investment of $30,000 amounted to nearly all of Ms. Garcia's investment savings. She had hoped it would provide her with a little extra income to supplement her social security benefits. Unfortunately, she fell victim to the Fraud Defendants' investment fraud and, instead, lost all of her savings.

89.    For several months following her investment, Ms. Garcia received monthly payments of $300 that supposedly represented revenues generated from the operation of the ATM machines she had purchased from and leased back to Defendants' Entities.

90.    Then, those payments ceased, and while Ms. Garcia desperately attempted to recover her $30,000 investment, she was not able to obtain any of her investment from the Defendants' Entities.

19

91.     When Ms. Garcia wrote to the senior managers of the Defendants' Entities to plea for the return of her investment, she sent the letter to Defendant Hoffman believing that he was the senior officer in control. Because of the misrepresentations and omissions of the Fraud Defendants and the Defendants' Entities, Ms. Garcia has lost all of her retirement investment capital.

*Jerry Gustin*

92.     In reliance on the misrepresentations and omissions of the Defendants' Entities, communicated in large part through their investment broker George Elliot, Plaintiffs Jerry and Bertha Gustin (the "Gustins") invested $500,000 in the Defendants' Entities. The Gustins first invested $100,000 in August 2003 to purchase and lease back twenty (20) ATM machines from the Defendants' Entities. The Gustins received monthly payments consistent with their investment contract that required a 12% annual return. In February 2004, the Gustins invested another $100,000 into the Defendants' Entities for another twenty (20) machines. Again, they were paid consistent with their investment contract.

93.     In December 2005, the Gustins then liquidated a substantial portion of their retirement savings in order to purchase yet another sixty (60) machines for an additional $300,000. And this was at a time that Defendants well understood that the Defendants' Entities were not only operating a Ponzi scheme, but operating a Ponzi scheme that was flat broke. By this time, Defendants were already bouncing checks written to their other investors, yet still they took $300,000 from Defendants, thereby increasing the Gustins' investment by 150% into the Defendants' obviously failed enterprise.

94.     Soon after their final investment into the Defendants' Entities, the monthly checks stopped coming in and the Gustins made pleas directly the to Defendants for the return of their investments.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

95.    Like the other Plaintiffs, the Gustins relied on the misrepresentations and omissions of the Fraud Defendants and the Defendants' Entities in investing into the Defendants' Entities. As a result, they lost approximately $500,000, the lion share of their retirement nest egg.

## CLASS ACTION ALLEGATIONS

96.    Plaintiffs bring this action as a class action against Defendants pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased, sold, held, and/or retained investments in the Defendants' Entities between April, 2003 and February, 2006 (the "Class").

### Requirements of Fed.R.Civ.P. 23(a)(1-4)

### Numerosity

97.    The individual class members are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes approximately 300 investors residing throughout the United States. While some of the Class reside in Florida, members of the Class are so numerous and geographically dispersed throughout the United States and abroad that joinder of all Class members is not feasible. Plaintiffs do not anticipate any difficulties in the management of this consolidated action as a class action.

### Commonality

98.    There are questions of law and fact that are common to the claims of Plaintiffs and the entire Class. Among these common questions are the following:

      a.    Whether the Fraud Defendants were control persons under the Exchange Act and/or part of the fraudulent scheme;

      b.    Whether the Fraud Defendants and the Defendants' Entities knowingly made material misrepresentations or omissions;

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

c.      Whether the Defendants' Entities were reckless in not knowing of the material omissions;

d.      Whether the Plaintiffs were damaged by the Defendants' course of conduct.

## Typicality

99.     Plaintiffs' claims are typical of the claims of the Class members and all Class members sustained damages arising out of the Defendants' wrongful conduct in violation of federal securities laws complained of herein.

100.    Upon information and belief, there has never been a prior lawsuit certified as a class action on behalf of Plaintiffs or the Class.

## Adequacy of Representation

101.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous persecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

102.    To prosecute this case, Plaintiffs retained the law firms of Damian & Valori, LLP and Dimond Kaplan & Rothstein, P.A., which are experienced in class action litigation, including class actions dealing with securities fraud and professional misconduct. The law firms have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

## Requirements of Fed.R.Civ.P. 23(b)(3)

### Predominance

103.   The questions of law or fact common to the claims of Plaintiffs and of each Class member predominate over any questions of law or fact affecting only individual members of the Class.  Reliance is presumed or proven on a class-wide basis, for three reasons:

(1)   All claims by Plaintiffs and the unnamed Class members involve overarching omissions, affecting the entire Class, including each Defendant's uniform omissions by failing to disclose: (a) that no promised sinking fund was being maintained to repurchase ATM machines from investors; (b) Defendant Digges' involvement in the scheme and his involvement in past criminal activity; (c) that the Defendants' Entities were being operated as a Ponzi scheme; (d) that state regulators found that the investment product marketed by the Fraud Defendants through the Defendants' Entities was an unregistered security; and (e) that Defendants and other insiders received large unearned payments from investor proceeds;

(2)   All claims by Plaintiffs and the unnamed Class members are based on the same alleged "across the board" conduct by the Defendants in a common fraudulent scheme of inducing them to purchase unregistered securities, to handle their retirement investments and to retain their investments at Defendants' Entities; and

(3)   The Defendants' Entities' securities were not traded on the open market, and could not have been offered on the market at any price but for the fraudulent scheme in which the Defendants participated.

23

104. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damage determinations. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as in the case at bar, common questions are held to predominate over individual questions.

105. The predominance requirement of Fed.R.Civ.P. 23(b)(3) is satisfied because all claims by Plaintiffs and the unnamed Class members are based on the same alleged "across the board" wrongful conduct of Defendants.

<strong>Superiority</strong>

106. A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

      a.    Joinder of all Class members would create extreme hardship and inconvenience for the affected investors (many of whom are elderly) because of their immense geographical dispersion. Class members reside outside of the state of Florida;

      b.    Individual claims by the Class members are impractical because the costs to pursue individual claims could exceed the value of what any one Class members has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

      c.    There are no known individual Class members who are interested in individually controlling the prosecution of separate actions against these defendants;

24

    d.     The interests of justice will be best served by resolving the common disputes of potential Class members in one forum;

    e.     Individual suits would not be cost effective, especially in light of the fact that the Class members are citizens of a number of different states and some are foreign nationals; and

    f.     The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

### COUNT I
### Violations of Section 10(b) of the Securities Exchange Act of 1934
### and Rule 10b-5, Control Persons Liability
### (as to Fraud Defendants)

107.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 106 as though fully set forth herein.

108.    Between 2003 and 2006, Fraud Defendants directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities described herein, have knowingly or severely recklessly: (a) employed a device, scheme and artifice to defraud; (b) made untrue statements of material facts and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

109.    Fraud Defendants carried out their scheme and made untrue statements of material facts, and omitted to state material facts, with actual knowledge of the materially misleading nature of the scheme and the misrepresentations and omissions, or in reckless disregard of the same.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

Plaintiffs and Class members have been damaged by the conduct of Fraud Defendants and the Defendants' Entities as alleged herein.

110.    As specifically alleged above, Fraud Defendants were, directly or indirectly, control persons of the Defendants' Entities for purpose of Section 20 of the Exchange Act, 15 U.S.C. §78t(a), in that they exercised and had actual control over the Defendants' Entities' general affairs, including the content of public statements disseminated by the Defendants' Entities.

111.    The Defendants' Entities violated Section 10(b) of the Exchange Act and rule 10b-5 thereunder.

112.    As control persons of the Defendants' Entities, Fraud Defendants are jointly and severally liable with and to the same extent as the Defendants' Entities for their violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

113.    As a direct and proximate result of the conduct alleged herein, Plaintiffs and the Class have suffered damages in connection with their investments with the Defendants' Entities.

### COUNT II
### Fraudulent Transfer
### (as to Defendant Kerr)

114.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 106 as though fully set forth herein.

115.    The transfers of funds to Defendant Kerr from the Defendants' Entities were inherently fraudulent because they were made as part of a Ponzi scheme. Defendants' actual intent was to hinder, delay, or defraud the creditors and/or investors of the Defendants' Entities.

116.    None of the Defendants' Entities received a reasonably equivalent value from Kerr or anyone acting on behalf of Kerr in exchange for the transfer. Nor did the Defendants' Entities

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

directly or indirectly benefit from the transfer. The transfer of monies to Kerr from the Defendants' Entities was made without valid consideration.

117.    At all material times, neither Defendants nor the Defendants' Entities had sufficient assets to meet their obligations.

118.    Throughout the course of the Ponzi scheme's operation, and specifically in connection with the transfer at issue here, Defendants and Defendants' Entities intended for the Defendants' Entities to incur, and they did incur, debts beyond the Defendants' Entities' ability to pay as they became due as a result of the transfer.

119.    Plaintiffs and the Class are entitled to avoid and recover the transfer of monies from the Fraud Defendants and the Defendants' Entities to Kerr as an actual or constructively fraudulent conveyance under Florida Statutes Chapter 726.

### COUNT III
### Fraudulent Transfer
### (as to Defendant Hoffman)

120.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 106 as though fully set forth herein.

121.    The transfers of funds to Defendant Hoffman from the Defendants' Entities were inherently fraudulent because they were made as part of a Ponzi scheme. Defendants' actual intent was to hinder, delay, or defraud the creditors and/or investors of the Defendants' Entities.

122.    None of the Defendants' Entities received a reasonably equivalent value from Hoffman or anyone acting on behalf of Hoffman in exchange for the transfer. Nor did the Defendants' Entities directly or indirectly benefit from the transfer. The transfer of monies to Hoffman from the Defendants' Entities was made without valid consideration.

DAMIAN & VALORI LLP 1000 BRICKELL AVENUE, SUITE 1020, MIAMI, FLORIDA 33131 • T: 305.371.3960 • F: 305.371.3965

123.    At all material times, neither Defendants nor the Defendants' Entities had sufficient assets to meet their obligations.

124.    Throughout the course of the Ponzi scheme's operation, and specifically in connection with the transfer at issue here, Defendants and Defendants' Entities intended to incur and did incur debts beyond the Defendants' Entities ability to pay as they became due as a result of the transfer.

125.    Plaintiffs and the Class are entitled to avoid and recover the transfer of monies from the Fraud Defendants and the Defendants' Entities to Hoffman as an actual or constructively fraudulent conveyance under Florida Statutes Chapter 726.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court:

a.    Certify this action as a class action under Fed. R. Civ. P. 23;

b.    Award Plaintiffs and the Class their damages, including pre-judgment interest, under each of the counts of this complaint;

c.    Award Plaintiffs and the Class punitive damages;

d.    Award Plaintiffs and the Class their attorneys fees, costs, and expenses under each of the counts of this Complaint;

e.    Avoid the fraudulent transfers under Counts II and III of this Complaint; and

f.    Award Plaintiffs and the Class such other and further relief as is appropriate in the interest of justice.

28

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable as a matter of right.

Dated: January __10__, 2008.

Respectfully submitted,

By:_____

Melanie Damian, P.A.
Fla. Bar No.: 0099392
Mdamian@dvllp.com
Kenneth D. Murena, P.A.
Fla. Bar No. 147486
Kmurena@dvllp.com
Peter F. Valori
Fla. Bar No. 43516
Pvalori@dvllp.com
Damian & Valori, LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone:     (305) 371-3060
Facsimile:     (305) 371-3965

29