UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. 6:08-CV-00057-GAP-DAB

JERRY GUSTIN and ELDA GARCIA,
individually and in their representative
capacity for all those similarly
situated,

              Plaintiffs,

v.

PAUL A. HOFFMAN, EDWARD S. DIGGES,
JR., and KATHERINE KERR,

              Defendants.

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jerry Gustin, Elda Garcia and Wesley Welling, individually and in their

representative capacity for all those similarly situated, sue Defendants Paul Hoffman ("Hoffman,")

and Edward J. Digges ("Digges") (Digges and Hoffman are referred to collectively as the "Fraud

Defendants"), and Katherine E. Kerr ("Kerr").

## INTRODUCTION

1.     Plaintiffs bring this action against the Fraud Defendants for their violations of

Sections 10(b) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), and against

Defendants Kerr and Hoffman for fraudulent transfer under Florida Statutes Chapter 726. Plaintiffs'

claims arise from a fraudulent scheme perpetrated by the Fraud Defendants by which hundreds of

investors were defrauded out of approximately $22 million through investments in a group of

corporate entities that Defendants owned or controlled.

2.     Specifically, Defendants used the following entities to defraud investors: Nexstar Communications, LLC ("Nexstar"), TMT Equipment Company, LLC; TMT Management Group, LLC ("TMT Management"); POSA, LLC ("POSA"), POSA TMT, LLC ("POSA TMT"); Camtucket LLC; Televest Communications, LLC; TMT International, LLC, Televest Group, LLC; KBK Partnership LLP; Chilham LLC; and Spin Drift, LLC (collectively the "Defendants' Entities").

3.     Most of the Defendants' Entities are currently in receivership as a result of an action brought by the Securities and Exchange Commission on February 2, 2006, in the United States District Court for the Middle District of Florida, *SEC v. Digges, et al.*, Case No. 6:06-cv-137-Orl-19KRS (the "SEC Action"). *See* Order Granting Permanent Injunction, Freezing Assets, Appointing a Receiver and Ordering Other Ancillary Relief, SEC Action, (the "Order Appointing Receiver," [D.E. 15][1]).  With the filing of the SEC Action, the Securities and Exchange Commission ("SEC") exposed the Defendants' Entities' fraud.  On that day, the SEC filed a Complaint for Emergency Injunctive and Other Relief (the "SEC Complaint," SEC Action, D.E. 1), and the Court entered an Order granting the relief sought by the SEC Complaint.  *See* SEC Action D.E. 7.

4.     It was only with the filing of the SEC Complaint that Plaintiffs and the Class became aware of the Defendants' Entities' fraud and uncovered the Fraud Defendants' role in perpetrating an investment fraud.

5.     The Order Appointing Receiver appointed James D. Silver, Esq. (the "Receiver") as the receiver of the most of the Defendants' Entities.   While Plaintiffs are technically creditors of the Receivership estate, notwithstanding the Receiver's diligent efforts, it is unlikely that Plaintiffs will receive more than a small fraction of the losses they suffered at the hands of the Defendants through

---

[1] Documents filed in the SEC Action shall be identified as follows: "SEC Action, D.E. *x*," where *x* is the docket entry number with respect to the SEC Action.

the Defendants' Entities' claims process.  Consequently, this lawsuit seeks to recover Plaintiffs' losses directly from those who controlled the Defendants' Entities–the Fraud Defendants–and those who received investor funds via fraudulent transfers designed to hinder the investors' ability to recover their losses.

6.     The two Fraud Defendants have been long time business associates and personal friends.  Defendant Hoffman was the best man in Defendant Digges's wedding to Defendant Kerr. Defendant Hoffman had a relatively distinguished reputation as a businessman for being, among other things, the Chairman and CEO of Ringler Associates, one of the nation's largest structured settlement firms.  Digges, on the other hand, was a disbarred attorney who had served time in jail for committing fraud.  According to Defendant Hoffman, in the past, he had lost significant sums of money in business enterprises with Defendant Digges.  The business enterprise the Fraud Defendants conducted through the Defendants' Entities was supposed to essentially pay back Defendant Hoffman for all of those losses.  Unfortunately, the Fraud Defendants ran the Defendants' Entities as a Ponzi scheme that bilked investors of some $22 million.

7.     Because the Fraud Defendants well understood that investors could be scared away from investing in the Defendants' Entities if they knew about the role of Defendant Digges, the Fraud Defendants actively concealed Defendant Digges's role and made Defendant Hoffman the figurehead for the enterprise.  As a result, investors, brokers, and even government regulators were under the impression that Defendant Hoffman was at the helm of the Defendants' Entities when, instead, it was Defendant Digges who played the most active leadership role.  As a result, the Fraud Defendants were able to amass millions in investments and skim millions for themselves and their family members.

3

8.      The nature of the fraud was as follows.  Between April 2003 and February 2006, the Fraud Defendants and the Defendants' Entities fraudulently sold securities in the form of investments in "point-of-sale" ATM terminals coupled with lease agreements.  The terminals were supposed to be, and sometimes actually were, placed at retail establishments, and were used by merchants to provide customers with funds from customer credit, debit, ATM, or gift cards.  The terminals were sold to investors by an entity controlled by the Fraud Defendants and leased back from the investors by another entity controlled by the Fraud Defendants.  The investors were promised a fixed rate of return equivalent to twelve percent per year.

9.      The Defendants' Entities, controlled by the Fraud Defendants, had been selling the terminals for $5,000 each, promising to pay the investors a twelve percent annual return for five years and offering to repurchase the terminals for the full $5,000 purchase price after five years.  The Defendants' Entities raised some $22 million from approximately 300 investors, many of whom are elderly.  The Fraud Defendants misrepresented that the lease payments are "assured," in part through a "reserve fund" that purportedly covered six months' worth of the monthly lease obligations.  The Defendants' Entities also misrepresented that the program maintained a "sinking fund" to fund the eventual repurchase of the terminals.  In addition, the Fraud Defendants concealed the role of Fraud Defendant Digges (a felon and disbarred attorney who had been convicted of fraudulent billing practices) in the ownership and control of the Defendants' Entities and, instead, touted Defendant Hoffman as the sole controller of the Defendants' Entities.

10.      In fact, the Fraud Defendants' program did not maintain any "sinking fund" or "reserve fund."  Since June 2005, the Fraud Defendants' scheme ran a substantial monthly deficit.  Thus, despite contracts with investors providing for the repurchase of terminals, the Defendants'

4

Entities did not have assets with which to repurchase the terminals at the end of the five-year period.

11.    The Fraud Defendants also failed to disclose that, since April 2003, three state securities commissions issued orders finding that one or more of the Defendants' Entities violated state securities laws by offering the same securities at issue in this matter.

12.    During the course of the fraud, the Defendants' Entities sold the terminals through one or more of the following entities that they controlled or owned: Nexstar, TMT Management Group, and TMT Equipment Company, LLC, and leased the terminals back through POSA and POSA TMT which they also owned or controlled.

13.    One or more of the Defendants' Entities were used to funnel investor funds to Defendant Kerr (the wife of Fraud Defendant Digges) to avoid making those funds available to the defrauded investor creditors of the Defendants' Entities.

14.    By virtue of this conduct, the Defendants' Entities violated Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, making the Fraud Defendants liable as control persons of the Defendants' Entities and Defendants Kerr and Hoffman liable for fraudulent transfer under Florida Statutes, Chapter 726.

## PARTIES

15.    Plaintiff Jerry Gustin is a citizen of the State of Texas who invested approximately $500,000 in the Defendants' Entities.

16.    Plaintiff Elda Garcia is a citizen of the State of Texas who invested approximately $30,000 in the Defendants' Entities.

17.    Plaintiff Wesley Welling is a citizen of the State of Florida who invested

approximately $50,000 in the Defendants' Entities.

18.     Defendants Hoffman and Digges controlled the Defendants' Entities.  Promotional materials represented that Defendant Hoffman controlled various of the Defendants' Entities as an executive officer.  In fact, the Fraud Defendants both controlled those entities as owners and senior officers.  Defendant Digges is a resident of Maryland and Defendant Hoffman is a resident of New York.

19.     Defendant Kerr is a Maryland resident and the wife of Digges.  She received at least $1 million in transfers from the Defendants' Entities, which had the intended and actual effect of hindering the investors' claims against the Fraud Defendants and the Defendants' Entities. Defendant Hoffman received at least $625,000 in transfers from the Defendants' Entities which had the intended and actual effect of hindering the investors' claims against the Fraud Defendants and the Defendants' Entities.

20.     Defendant  Digges and the Defendants' Entities are named as defendants in the SEC Action.

21.     Defendants Digges, Hoffman and Kerr were also named as defendants by the Receiver in actions ancillary to the SEC Action.

### JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b).

23.     This Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida because: a) Defendants have engaged in significant business in Orange County, Florida; b) Defendants' wrongful conduct occurred in significant part in Orange County,

Florida; and (c) Defendants Digges, Hoffman, Kerr and the Defendants' Entities were defendants in the SEC Action and/or in ancillary actions in the Middle District of Florida brought on claims related to those brought herein.

24.     Specifically, this Court has personal jurisdiction over Defendants Hoffman and Digges pursuant to § 48.193 of the Florida Statutes because Plaintiffs' cause of action arises out of Digges' and Hoffman's business activities through the Defendants' Entities and their sales agents in Florida.  Such activities evidence that Defendants Hoffman and Digges maintained the requisite minimum contacts with Florida so that exercising personal jurisdiction over them will not constitute a violation of their due process rights.

25.     During the relevant period, Defendant Digges created the investment scheme and organized and operated the Defendants' Entities.  And Defendant Hoffman had ownership in and served in an executive capacity with those Defendants' Entities.  Defendants' Entities represented to investors that Defendant Hoffman was the person in charge and used his reputation as a successful businessman to lure in funds from Florida residents as well as from other investors located all over the country, like Plaintiffs.  Defendant Hoffman has testified to having a significant ownership interest in all of the Defendants' Entities, which he claims were created by Defendant Digges. Hoffman had continued ownership in the credit card terminal venture and ownership of Televest, the company at the top of Defendants' Entities umbrella organization.  Moreover, Defendant Hoffman's behavior with respect to the Defendants' Entities was not consistent with that of a passive investor.

26.     Indeed, Hoffman was so involved with Defendants' Entities that he was personally served with the cease and desist letter from the State of Pennsylvania for securities violations therein. The State of Pennsylvania found that Defendant Hoffman and several of Defendants' Entities had

violated certain provisions of the 1972 Act. The findings also provided that, as of November 17, 2003, Hoffman was the chairman and CEO of Nexstar and president of POSA, and Hoffman agreed to such findings.   Defendant Hoffman has also signed as CEO of Defendant Entity, TMT International, LLC, when he was setting up a bank account for the company at HSBC bank, serving as a signatory and using the address of his entity Ringler Associates.

27.     At around the same time, Defendant Hoffman received a K-1 from Spin Drift, LLC stating that he had been allocated over $1 million in profits and distributions and he received a transfer of $625,000 in April 2004 to cover the related tax liabilities.   And, as late as February 18, 2005, he represented himself as the chairman of Televest in answering an inquiry from a potential investor. The day before that communication, Hoffman had lent $75,000 to TMT Management Group.  Hoffman's actions were not that of a passive investor.

28.     In addition, while seeking investors, Defendants' Entities conducted substantial operations in Florida, including offering and selling securities in the Middle District of Florida. Defendant Hoffman has admitted knowledge that the terminals were being sold by Defendants' Entities in Florida where they believed the case law was more favorable than that of other parts of the country for permitting the sale leaseback of the credit card terminals.  In fact, Defendant Hoffman has claimed that the terminals would only be sold as an investment product where permitted by law and Hoffman asserted Florida law permitted such sales.  Thus, Defendant Hoffman knew he was conducting substantial business operations in Florida and he knew that people in Florida were receiving information marketing the sale of terminals as investment products. Therefore, Defendant Hoffman has the minimum contacts with the State of Florida required to apply Florida long-arm jurisdiction to him.

29.     Defendants, by operation of the Defendants' Entities, hired brokers and lured investors into their fraudulent scheme in various states, including Florida.  Their conduct in Florida is evidenced by Plaintiff Wesley Welling, a Florida resident, who was contacted by Defendants' agent both in person and over the telephone to effectuate his investment in the Defendants' Entities. Mr. Welling was solely solicited by a Tampa-based Nexstar representative. All of the investment transactions were performed at Mr. Welling's home in Florida.  Moreover, Mr. Welling's purchase agreement contains a Florida Addendum to Millennium Terminal Purchase Agreement which provides Nexstar's Florida Business Opportunity Registration Number and a registered office and registered agent for Nexstar in Boca Raton, Florida.  Mr. Welling executed and returned the Addendum to Nexstar believing that he would have recourse against the entity and its principals in Florida.

30.     Various Plaintiffs received correspondence, agreements and certificates of title from Defendant Entities POSA TMT and TMT Management indicating an office in Orlando, Florida. According to promotional brochures marketing the investment scheme to Plaintiffs in various states, TMT Management was based and operated out of Orlando, Florida.  In fact, in the brochures, Plaintiffs were asked to contact an agent in Orlando, Florida to participate in the TMT Management program.  And certain funds invested in Nexstar by Plaintiffs were deposited into Nexstar's Wachovia bank account in Orlando, Florida.

31.     Defendant Kerr had knowledge of and involvement in her husband Digges' business ventures.  She participated by consulting with Defendant Digges and assisting him in making decisions about the operations of his business ventures including the investment scheme.  She has admitted that she played a role in all of his businesses as a consultant and as a recipient of  funds.

She knew or should have known that those businesses were operating in Florida.  Her involvement

in the business resulted in harm to Plaintiffs, including Wesley Welling located in Florida.  As such,

Defendant Kerr had minimum contacts with Florida, as required under § 48.193 of the Florida

Statutes.

32.    Venue is also proper in this district pursuant to 28 U.S.C. §1391(c) because a

substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in and/or

originated from the Middle District of Florida.

33.    Further, Defendants, directly and indirectly, have made use of the means and

instrumentalities of interstate commerce, and the mails, in connection with the acts, practices and

courses of business set forth in this Complaint.

## GENERAL ALLEGATIONS

### The Defendants' Entities' Business Scheme

34.    From at least April 2003 through  February 2006, the Defendants' Entities sold more

than $22 million in investments in point-of-sale terminals to approximately 300 investors throughout

the United States.

35.    Point-of-sale terminals were instruments typically placed at retail establishments,

which merchants used to swipe customer credit, debit, ATM, or gift cards.  The terminals verified

whether a customer had sufficient available credit or funds to make a particular purchase.

36.    The Fraud Defendants' investments were marketed to investors, including Plaintiffs,

through brokers who were provided promotional investment literature.  The Fraud Defendants

brandished the name of Defendant Hoffman on their promotional literature in order to provide

credibility to the brokers and investors.  And brokers and investors did in fact rely on the affiliation

10

of Defendant Hoffman with the Defendants' Entities in promoting and purchasing the Fraud Defendants' investments.

37.     Defendant Hoffman also used his entity, Ringler Associates, to market the investment scheme.  His sales agents distributed literature about Ringler Associates as "the world's oldest and largest settlement annuity firm" to add credibility to the investments they were selling. *See* Ringler Associates' website at www.ringlerassociates.com.  At least one such sales agent was listed as an employee of Ringler Financial Services, Inc. and this employment was used to convince investors to part with their funds and place them in the Defendants' Entities.  At the time of the investment scheme, Ringler Associates' website displayed Defendant Hoffman as its Chairman.  The literature also showed Ringler Associates as having offices "in principal cities nationwide", including eight offices in Florida, six of which are located in the Middle District of Florida.

38.     The investments were structured so that an investor purchased terminals from one of the Defendants' Entities for $5,000 and simultaneously entered into a leaseback agreement with another of Defendants' Entities.

39.     Under the leaseback agreement, the investors received monthly lease payments of $50 per terminal purchased, representing a twelve percent annual return, for five years.

40.     The Fraud Defendants represented that lease payments came from revenues generated whenever merchants used the terminals.  The lease payment to the particular investor was purportedly paid from the revenues of the leasing entity, and did not depend upon the performance of a particular terminal.  For example, Nexstar's literature represented that for every transaction a merchant processed through a Nexstar terminal, Nexstar would earn $.05 for every debit card transaction and $.025 for ever credit card transaction.  Investors have no role in the management of

their terminal.  All managerial and functional responsibilities were handled by the entity leasing the terminal from the investors or others acting at the entity's behest.

41.     The lease arrangement obligated the Defendant's Entity leasing the terminal to repurchase the terminal for $5,000 at the end of the lease.  Under the various lease agreements, investors also had the right to have their terminals repurchased prior to the expiration of the five-year lease terms.  A number of investors actually sought to exercise their right to sell their terminals pursuant to these provisions; however, with respect to many of these investors, the Defendants' Entities did not fulfill its obligation to repurchase the terminals.

42.     Fraud Defendants had been selling these investments through a network of sales agents, principally insurance agents, financial planners, and certified public accountants, that stretched throughout the United States, but was primarily concentrated in Texas, California, Michigan, and Florida.

43.     That network was structured like a pyramid, with sales agents who sold the Fraud Defendants' investments directly to investors and other sales agents who had developed their own "downstream" network of sales agents.

44.     Investors in the Fraud Defendants' program paid total sales commissions ranging from twelve to eighteen percent of their total investment, which was then apportioned as compensation to sales agents "upstream" through the network.

45.     Between April 2003 and December 2003, the Fraud Defendants offered and sold the terminals through Nexstar, and used POSA to lease the terminals back from investors.

46.     During this period, investors were required to purchase a minimum of two terminals for $5,000 each.

47.     Upon payment of the funds, investors entered into three agreements: (i) a terminal purchase agreement between the investor and Nexstar; (ii) a lease agreement between the investor and POSA, requiring POSA to pay the investor $50 per month per terminal in exchange for placing, operating, and maintaining the terminal in a retail store; and (iii) an "option to sell agreement" that gave the investor the option to require POSA at the end of five years to repurchase the terminal from the investor for its full original purchase price of $5,000.

48.     Investors were given the option, and provided the forms, to purchase terminals in an Individual Retirement Account ("IRA") and, in the event that option was chosen, referred to a third-party IRA administrator located in California to service their account.

49.     Although investors also technically were given the option to buy and operate the terminals themselves, all of the investors leased the terminals to POSA in exchange for monthly lease payments.

50.     To promote sales of their investment program, the Fraud Defendants had marketing materials prepared that described the terminals and their program and arranged for presentations to sales agents at Nexstar's offices in Orlando, Florida.  The Fraud Defendants placed other marketing materials on a website.

51.     The Fraud Defendants also prepared and filed disclosure statements with the Federal Trade Commission ("FTC") and various state agencies.

52.     Along with their marketing materials, those disclosure statements, or portions of them, were provided to sales agents for their training and eventually used as promotional materials for investors.  Those statements represented, among other things, that Defendant Hoffman was

Chairman and/or CEO of two of the Defendants' Entities that marketed to and received funds from investors, Nexstar Communications, LLC and TMT Management.

53.    On November 17, 2003, the state securities commissions of Maryland and Pennsylvania issued against Nexstar and POSA certain Summary Orders to Cease and Desist ("Summary Orders") from offering and selling terminal investments in those respective states. From that point, in an attempt to avoid the technical restrictions of the Summary Orders, but certainly in violation of the spirit of those orders, the Fraud Defendants marketed the Defendants' Entities investments, primarily from Florida.

54.    Thereafter, through the present, the Fraud Defendants continued to offer the same investment product, but began using TMT Management and later TMT Equipment to sell the terminals, and POSA TMT to leaseback the terminals from investors.

55.    When the Fraud Defendants began selling terminals through TMT Management and TMT Equipment, they used Spin Drift and Televest Group to transfer funds among the various Defendants' Entities.

56.    The Fraud Defendants also used Televest Group to fund lease payments to the investors and used Spin Drift to repurchase terminals from certain investors.

57.    Despite using different entities, the Defendants' Entities' investment program remained essentially unchanged, except that the Defendants' Entities increased the minimum investment from two terminals to five.

**Defendant Hoffman's Ownership and Control over the Defendants' Entities**

58.    Defendant Hoffman testified that, prior to his involvement with the Defendants' Entities, Hoffman repeatedly lost money with respect to his business ventures with Defendant

Digges.  According to Hoffman, he was supposed to finally recoup those losses with this new scheme.  Unfortunately, Hoffman's recoupment was to be accomplished through fraud.

59.    The Fraud Defendants, Hoffman and Digges, essentially were 50-50 partners in the Defendants' Entities. Through a web of companies, the Fraud Defendants owned and controlled the Defendants' Entities.  Because Digges was a convicted felon, it would have been unwise to mention Digges's role in the ownership and management of the Defendants Entities.  Hoffman, on the other hand, had a relatively distinguished reputation as a businessman.  Consequently, the Fraud Defendants represented to investors and brokers that Hoffman was the person in charge of the Defendants' Entities, and concealed from investors the role that Digges played in management.

60.    Defendant Digges entered into a settlement with the SEC and the Receiver in connection with his ownership and control of the Defendants' Entities acknowledging Digges' involvement in the management of the Defendants' Entities.

61.    Defendant Hoffman claims that he was not involved in the management of the Defendants' Entities, but was merely a passive investor.  However, contrary to his claims, Hoffman: (i) was involved in and profited from the management of the Defendants' Entities, (ii) was aware, or should have been aware, that the Defendants' Entities were committing securities fraud with their investment products; and (iii) was in a position to stop the wrongful conduct being committed by the Defendants' Entities.

62.    Indeed, Hoffman not only allowed the Defendants' Entities to bilk investors, he was actively involved in promoting the Defendants' Entities' wrongful conduct.  What follows are specific examples of Hoffman's participation in the promotion of the wrongful conduct of the Defendants' Entities that are reflected in documents.

A.    <u>Defendant Hoffman Lured Investors</u>

63.    Hoffman's name was prominently listed on the investment literature circulated by the Defendants' Entities.  That literature represented that Hoffman was in charge of certain key Defendants' Entities.  Defendant Hoffman's control of the Defendants' Entities was also touted by one or more web sites maintained by the Defendants' Entities.  In addition, Hoffman's control of the Defendants' Entities was touted by direct word of mouth to brokers and investors.

64.    Defendant Hoffman knew that his name was being used by the Defendants' Entities to market its products to investors.  Yet Hoffman took no meaningful steps to disassociate his name from the Defendants' Entities.  As a result, brokers solicited and investors invested funds in the Defendants' Entities in reliance on their belief that Hoffman was at the helm of the Defendants' Entities.

B.    <u>Defendant Hoffman Knew the Defendants' Entities Had Defrauded Investors</u>

65.    Defendant Hoffman not only was aware that  the Defendants' Entities were using his name to market its products to investors, he also knew or should have known that the Defendants' Entities were perpetrating a fraud.  One reason Hoffman knew or should have known about the wrongful conduct of the Defendants' Entities is that he knew that Digges was convicted of and had served time in jail for fraud.

66.    Defendant Hoffman also had direct knowledge that the Defendants' Entities could not deliver on the promises they made to investors.  For example, Hoffman negotiated directly with a disgruntled investor of Nexstar Communications, LLC.  The investor claimed that he had been defrauded and Hoffman communicated with the investor and arranged for a refund of his investment

16

into Nexstar Communications, LLC, in order to "get rid of him" as a "problem" for the Defendants' Entities.

67.     Hoffman received notice that two of the Defendants' Entities, Nexstar, POSA and Hoffman himself were cited by the Pennsylvania authorities for violating that state's securities laws. That same notice identified Hoffman as the "CEO" of Nexstar and POSA.  In settling the charges brought by the Pennsylvania authorities, Hoffman consented to the finding that he was chairman and CEO of Nexstar and purported president of POSA.

68.     Defendants' Entity TMT International LLC ("TMT International") was an entity owned and controlled by the Fraud Defendants.  Hoffman established a bank account for TMT International and in setting up the account, he listed himself as "CEO" of TMT International with the understanding that the entity was created as an additional vehicle to market the Fraud Defendants' investments overseas.

69.     The internal written correspondence of the Defendants' Entities indicate that Hoffman was involved in, and certainly aware of, the planning and operations of one or more of the Defendants' Entities.  That correspondence, which Hoffman himself received, repeatedly referred to Hoffman as the ultimate control person with respect to various of the Defendants' Entities.

C.     Defendant Hoffman Participated in the Management of the Defendants' Entities

70.     Hoffman actively engaged in the management of the Defendants' Entities by, among other things (including those activities identified above), participating in management conferences. According to a participant at one such conference, Hoffman himself suggested deepening the Defendants' Entities fraudulent conduct by using an already underfunded investor reserve fund (a

17

fund that investors had been promised would be used to repurchase their terminals) to fund a new business enterprise.

        D.      <u>Defendant Hoffman Was Enriched by the Defendants' Entities</u>

71.      According to his tax schedules, Hoffman received hundreds of thousands of dollars in profits as a result of his ownership interest in the Defendants' Entities.  At least $625,000 of Hoffman's returns came in the form of direct cash payments.

        E.      <u>Defendant Hoffman Had the Power to Stop the Fraud</u>

72.      Because Hoffman, directly or indirectly, owned 50 percent of each of the Defendants' Entities, he had the power to stop, at any time, their fraudulent conduct.  Had Hoffman merely exercised his legal right to prevent the Defendants' Entities from engaging in conduct that defrauded investors, conduct he knew or should reasonably have known was taking place on his watch, he could have saved investors many millions of dollars.

73.      Because Hoffman owned and controlled the Defendants' Entities, he (like his cohort Digges) is liable for the misrepresentations and omissions of the Defendants' Entities.  Those misrepresentations and omissions are set forth in more detail in the following section.

**DEFENDANTS' ENTITIES' MISREPRESENTATIONS AND OMISSIONS**

**Misrepresenting the Existence of a Sinking Fund to Repurchase ATM Machines**

74.      The offering materials ("Offering Materials") prepared by the Defendants' Entities and distributed to the sales force and investors represented that the lease payments were "assured." In fact, since the inception, the investment program ran a deficit and did not have the assets to pay the promised lease payments or to repurchase the terminals.

75.      Defendants' Entities' marketing materials represented that the obligations of POSA to pay monthly lease payments were "assured" through the creation of a "reserve fund." Specifically,

the materials stated that "[t]o help insure that the monthly lease payments are available as due to our lessors, POSA maintains a six (6) month cash reserve fund for each and every lease it maintains."

76.     The Offering Materials that were distributed to the sales force and to investors represent that the lease payments to investors were "assured," in part because the Defendants' Entities maintained a "reserve fund."

77.     Specifically, the Offering Materials stated, "[t]o help insure that the monthly lease payments are available as due to our lessors, POSA maintains a six (6) month cash reserve fund for each and every lease it maintains."

78.     The Defendants' Entities also represented that they maintained a "reserve fund" or "sinking fund" to assure the repurchase of terminals. For example, in or around 2003, Digges told Christopher Morris, a sales agent, that the sinking fund for terminal repurchase was maintained at Fidelity Investments and, with each terminal purchase, funded with a $1,000 contribution from the Defendants' Entities and thereafter $75 per month during the term of the five-year lease.

79.     The Defendants' Entities also told a group of sales agents that the Defendants' Entities maintained a reserve fund, which was invested in federal government treasury obligations.

80.     In addition, Chris Haug, the chief financial officer of Nexstar, represented in a January 29, 2004 letter to Jack Brown, another sales agent selling Defendants' investment program, that a reserve fund would be maintained.

81.     In truth, the Defendants' Entities never established a reserve fund or sinking fund to cover the lease payments or the repurchase of terminals.

**Misrepresentations and Omissions Related to Management Experience and Integrity**

82.     Defendants' Entities' Offering Materials also touted the experience, expertise, and integrity of management, representing that, within the previous seven years, management had no criminal or civil liability involving fraud.

83.     The Offering Materials prominently mentioned Hoffman, but concealed Digges' substantial and controlling role in the program and did not disclose Digges' 1990 mail fraud conviction, which arose from client over-billing.

84.     Defendants' Entities' Offering Materials also failed to disclose the 1989 civil judgment against Digges for fraud, deceit, and breach of contract.  That judgment ordered Defendant Digges and his law firm, jointly and severally, to pay $3,634,801.92.

85.     Nor do the Offering Materials disclose that Digges, formerly a lawyer licensed in Maryland, was disbarred following his felony conviction.  Both of the other Fraud Defendants knew of Digges' conviction.

86.     After the Summary Orders were issued, the Defendants' Entities also failed to disclose that the Fraud Defendants had been specifically cited for violating securities laws in connection with the exact same investment product they were then marketing.  The Summary Order from Maryland found that the Fraud Defendants had committed fraud which, likewise, was never disclosed to investors.

**The Defendants' Entities Were Operated as a Ponzi Scheme**

87.     The Defendants' Entities began operating at a deficit at or near their inception in November 2002, and the deficit widened as time progressed, reaching at least $140,000 per month by the first quarter of 2005.

20

88.     Those deficits arose because the revenue from terminals that were actually placed with merchants, referred to as "residual payments," were minimal compared to: (a) the lease obligations to investors; and (b) the substantial amount of investor proceeds that Defendants regularly transferred to or for the benefit of themselves or their family members.

89.     Because the Defendants' Entities that had contracted to lease and repurchase the credit card terminals from investors did not have sufficient funds to cover their obligations, the Fraud Defendants operated the Defendants' Entities as a Ponzi scheme, directing the Defendants' Entities to use funds from new investors to pay the Defendants Entities' lease and repurchase obligations.

90.     Investors were never told that the Defendants' Entities operated as a Ponzi scheme.

**Defendants Concealed the State Summary Orders**

91.     After December 2003, investors were not told, through the Offering Materials or otherwise, that the state securities commissions of Maryland and Pennsylvania had issued those Summary Orders finding that one or more of Defendants' Entities had violated state securities laws by engaging in the offering.

92.     Investors also were not told that, in October 2004, the state securities commission of Ohio issued an order finding that one or more Defendants' Entities had violated Ohio's securities laws by engaging in the offering.

93.     The Fraud Defendants did not disclose that the Maryland Summary Order included a finding that the offering involved fraud.

**Defendants Concealed Commissions and Payments to Insiders**

94.     Prospective investors also were not advised, through the Offering Materials or otherwise, of the existence or the magnitude of the sales commissions that investors were paying to sales agents on terminal investments, *i.e.*, twelve to eighteen percent of their total invested funds.

21

95.     Defendants were also paid huge sums by the Defendants' Entities and those amounts were not disclosed.

96.     Throughout the venture, Kerr claims that she consulted with her husband regarding all of his business dealings, but she provided no goods or services to any of the Defendants' Entities. Nevertheless, she received the benefit of at least $1 million of investor funds from the Defendants' Entities during which time the Entities were operating at a deficit.

97.     Defendant Hoffman received cash directly from the Defendants' Entities.  Indeed, Plaintiffs are aware of at least one instance when Defendant Hoffman received such a cash payment. In April 2004 Defendant Hoffman received $625,000 from the Defendants' Entities.  At the time the transfer was made to Hoffman, the Defendants' Entities were completely insolvent.

### ALLEGATIONS AS TO PLAINTIFFS

98.     Plaintiff Elda Garcia is an elderly, handicapped widow, with no survivor pension benefits whatsoever, who lives in San Antonio Texas.  Through Defendants' Entities' agent, Ms. Garcia was persuaded to purchase and lease-back six ATM machines from the Defendants' Entities in reliance on Defendants' Entities' various misrepresentations and omissions, for a total investment of $30,000.

99.     The investment of $30,000 amounted to nearly all of Ms. Garcia's investment savings.  She had hoped it would provide her with a little extra income to supplement her social security benefits.  Unfortunately, she fell victim to the Fraud Defendants' investment fraud and, instead, lost all of her savings.

100.    For several months following her investment, Ms. Garcia received monthly payments of $300 that supposedly represented revenues generated from the operation of the ATM machines she had purchased from and leased back to Defendants' Entities.

101.    Then, those payments ceased, and while Ms. Garcia desperately attempted to recover her $30,000 investment, she was not able to obtain any of her investment from the Defendants' Entities.

102.    When Ms. Garcia wrote to the senior managers of the Defendants' Entities to plea for the return of her investment, she sent the letter to Defendant Hoffman believing that he was the senior officer in control.  Because of the misrepresentations and omissions of the Fraud Defendants and the Defendants' Entities, Ms. Garcia has lost all of her retirement investment capital.

103.    Similarly, in reliance on the misrepresentations and omissions of the Defendants' Entities, communicated in large part through their investment broker George Elliot, Plaintiff Jerry Gustin invested $500,000 in the Defendants' Entities.  Mr. Gustin first invested $100,000 in August 2003 to purchase and lease-back twenty ATM machines from the Defendants' Entities.  Mr. Gustin received monthly payments consistent with his investment contract that required a twelve percent annual return.  In February 2004, Mr. Gustin invested another $100,000 into the Defendants' Entities for another twenty machines.  Again, he was paid consistent with his investment contract.

104.    In December 2005, Mr. Gustin liquidated a substantial portion of his retirement savings in order to purchase yet another sixty machines for an additional $300,000.  And this was at a time that the Fraud Defendants well understood that the Defendants' Entities were not only operating a Ponzi scheme, but operating a Ponzi scheme that was flat broke.  By this time, the Defendants' Entities were already bouncing checks written to their other investors, yet still they took $300,000 from Mr. Gustin, thereby increasing Mr. Gustin's investment by 150 percent into the Fraud Defendants' obviously failed enterprise.

105.     Soon after their final investment into the Defendants' Entities, the monthly checks stopped coming in and Mr. Gustin made pleas directly to the Fraud Defendants for the return of his investments.

106.     Like the other Plaintiffs, Mr. Gustin relied on the misrepresentations and omissions of the Fraud Defendants and the Defendants' Entities in investing into the Defendants' Entities.  As a result, he lost approximately $500,000, the lion share of his retirement nest egg.

107.     Wesley Welling was similarly lured into investing $50,000 in the Defendants' Entities through a Florida-based broker.  He was contacted by a Tampa-based Nexstar representative, Gary Humesky, who assured him that this was "one of the best business opportunities in the market today."  Mr. Humesky had Mr. Welling submit his investment to Nexstar and sign lease agreements with POSA.  For a short time, he received the promised lease payments, and then they stopped, leaving him without retirement savings and a devoid of steady income.

108.     The other potential class plaintiffs are similarly situated to Ms. Garcia, Mr. Gustin and Mr. Welling in that they generally invested their lives savings with the Defendants' Entities in reliance on Defendants' Entities' agents, who promised a guaranteed return and ensured no possibility of loss on the investment.  These potential plaintiffs are now living without savings and many are elderly and/or handicapped and without the ability to seek employment.

109.     Thus, with respect to each of the Plaintiffs, the  Fraud Defendants' and their agents' misrepresentations, omissions and fraud caused Plaintiffs to invest into the Defendants' Entities thereby resulting in the loss of millions of dollars.

24

## CLASS ACTION ALLEGATIONS

110.     Plaintiffs bring this action as a class action against Defendants pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased, sold, held, and/or retained investments in the Defendants' Entities between April, 2003 and February, 2006 (the "Class").

### Requirements of Fed. R. Civ. P. 23(a)(1-4)

### Numerosity

111.     The individual class members are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes approximately 300 investors residing throughout the United States.  While some of the Class reside in Florida, members of the Class are so numerous and geographically dispersed throughout the United States and abroad that joinder of all Class members is not feasible.  Plaintiffs do not anticipate any difficulties in the management of this consolidated action as a class action.

### Commonality

112.     There are questions of law and fact that are common to the claims of Plaintiffs and the entire Class.  Among these common questions are the following:

  a. Whether the Fraud Defendants were control persons under the Exchange Act and/or part of the fraudulent scheme;

  b. Whether the Fraud Defendants and the Defendants' Entities knowingly made material misrepresentations or omissions;

  c. Whether the Defendants' Entities were reckless in not knowing of the material omissions;

  d. Whether the Plaintiffs were damaged by the Defendants' course of conduct.

**Typicality**

113.    Plaintiffs' claims are typical of the claims of the Class members and all Class members sustained damages arising out of the Defendants' wrongful conduct in violation of federal securities laws complained of herein.

114.    Upon information and belief, there has never been a prior lawsuit certified as a class action on behalf of Plaintiffs or the Class.

**Adequacy of Representation**

115.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous persecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

116.    To prosecute this case, Plaintiffs retained the law firms of Damian & Valori, LLP and Dimond Kaplan & Rothstein, P.A., which are experienced in class action litigation, including class actions dealing with securities fraud and professional misconduct.  The law firms have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**Requirements of Fed. R. Civ. P. 23(b)(3)**

**Predominance**

117.    The questions of law or fact common to the claims of Plaintiffs and of each Class member predominate over any questions of law or fact affecting only individual members of the Class.  Reliance is presumed or proven on a class-wide basis, for three reasons:

(1)   All claims by Plaintiffs and the unnamed Class members involve overarching omissions, affecting the entire Class, including each Defendant's uniform omissions by failing to disclose: (a) that no promised sinking fund was being maintained to repurchase ATM machines from investors; (b) Defendant Digges' involvement in the scheme and his involvement in past criminal activity; (c) that the Defendants' Entities were being operated as a Ponzi scheme; (d) that state regulators found that the investment product marketed by the Fraud Defendants through the Defendants' Entities was an unregistered security; and (e) that Defendants and other insiders received large unearned payments from investor proceeds;

(2)   All claims by Plaintiffs and the unnamed Class members are based on the same alleged "across the board" conduct by the Defendants in a common fraudulent scheme of inducing them to purchase unregistered securities, to handle their retirement investments and to retain their investments at Defendants' Entities; and

(3)   The Defendants' Entities' securities were not traded on the open market, and could not have been offered on the market at any price but for the fraudulent scheme in which the Defendants participated.

118.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damage determinations.  As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as in the case at bar, common questions are held to predominate over individual questions.

119.    The predominance requirement of Fed.R.Civ.P. 23(b)(3) is satisfied because all claims by Plaintiffs and the unnamed Class members are based on the same alleged "across the board" wrongful conduct of Defendants.

**Superiority**

120.    A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

a.    Joinder of all Class members would create extreme hardship and inconvenience for the affected investors (many of whom are elderly) because of their immense geographical dispersion.  Class members reside outside of the state of Florida;

b.    Individual claims by the Class members are impractical because the costs to pursue individual claims could exceed the value of what any one Class members has at stake.  As a result, individual Class members have no interest in prosecuting and controlling separate actions;

c.    There are no known individual Class members who are interested in individually controlling the prosecution of separate actions against these defendants;

d.    The interests of justice will be best served by resolving the common disputes of potential Class members in one forum;

e.    Individual suits would not be cost effective, especially in light of the fact that the Class members are citizens of a number of different states and some are foreign nationals; and

      f.      The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

**COUNT I**
**Violations of Section 10(b) of the Securities Exchange Act of 1934**
**and Rule 10b-5, Control Persons Liability**
<u>**(as to Fraud Defendants)**</u>

121.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 120 as though fully set forth herein.

122.    Between 2003 and 2006, Fraud Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities described herein, have knowingly or severely recklessly: (a) employed a device, scheme and artifice to defraud; (b) made untrue statements of material facts and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

123.    Fraud Defendants carried out their scheme and made untrue statements of material facts, and omitted to state material facts, with actual knowledge of the materially misleading nature of the scheme and the misrepresentations and omissions, or in reckless disregard of the same. Plaintiffs and Class members have been damaged by the conduct of Fraud Defendants and the Defendants' Entities as alleged herein.

124.    As specifically alleged above, Fraud Defendants were, directly or indirectly, control persons of the Defendants' Entities for purpose of Section 20 of the Exchange Act, 15 U.S.C. §78t(a), in that they exercised and had actual control over the Defendants' Entities' corporate policy

29

and general affairs, including the content of public statements disseminated by the Defendants'
Entities.

125.    The Defendants' Entities violated Section 10(b) of the Exchange Act and rule 10b-5
thereunder.

126.    As control persons of the Defendants' Entities, Fraud Defendants are jointly and
severally liable with and to the same extent as the Defendants' Entities for their violations of Section
10(b) of the Exchange Act, 15 U.S.C. § 78(b), and rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

127.    As a direct and proximate result of the conduct alleged herein, Plaintiffs and the Class
have suffered damages in connection with their investments with the Defendants' Entities.

**COUNT II**
**Fraudulent Transfer**
**<u>(as to Defendant Kerr)</u>**

128.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 120 as though
fully set forth herein.

129.    The transfers of funds from the Defendants' Entities to Defendant Kerr were
inherently fraudulent because they were made as part of a Ponzi scheme.  Defendants' actual intent
in making the transfers was to hinder, delay, or defraud the creditors and/or investors of the
Defendants' Entities.

130.    None of the Defendants' Entities received a reasonably equivalent value from Kerr
or anyone acting on behalf of Kerr in exchange for the transfers to Kerr.  Nor did the Defendants'
Entities directly or indirectly benefit from those transfers.  Kerr received the transfers of monies
from the Defendants' Entities without providing valid consideration.

131.    At all material times, neither Defendants nor the Defendants' Entities had sufficient
assets to meet their obligations.

132.    Throughout the course of the Ponzi scheme's operation, and specifically in connection with the transfers at issue here, Defendants and Defendants' Entities intended, as a result of the transfers, for the Defendants' Entities to incur, and they did incur, debts beyond the Defendants' Entities' ability to pay as they became due.

133.    As a direct and proximate result of the fraudulent transfers to Kerr, the assets of the Defendants' Entities were substantially diminished resulting in significantly less funds available for distribution to Defendants' Entities' creditors, including Plaintiffs and the Class.

134.    Plaintiffs and the Class are entitled to avoid and recover the transfer of monies from the Fraud Defendants and the Defendants' Entities to Kerr as an actual or constructively fraudulent conveyance under Florida Statutes Chapter 726.

## COUNT III
### Fraudulent Transfer
### (as to Defendant Hoffman)

135.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 120 as though fully set forth herein.

136.    The transfers of funds from the Defendants' Entities to Defendant Hoffman were inherently fraudulent because they were made as part of a Ponzi scheme.  Defendants' actual intent in making the transfers was to hinder, delay, or defraud the creditors and/or investors of the Defendants' Entities.

137.    None of the Defendants' Entities received a reasonably equivalent value from Hoffman or anyone acting on behalf of Hoffman in exchange for the transfers to Hoffman.  Nor did the Defendants' Entities directly or indirectly benefit from those transfers.  Hoffman received the transfers of monies from the Defendants' Entities without providing valid consideration.

31

138.    At all material times, neither Defendants nor the Defendants' Entities had sufficient assets to meet their obligations.

139.    Throughout the course of the Ponzi scheme's operation, and specifically in connection with the transfers at issue here, Defendants and Defendants' Entities intended, as a result of the transfers, to incur and did incur debts beyond the Defendants' Entities ability to pay as they became due.

140.    As a direct and proximate result of the fraudulent transfers to Hoffman, the assets of the Defendants' Entities were substantially diminished resulting in significantly less funds available for distribution to Defendants' Entities' creditors, including Plaintiffs and the Class.

141.    Plaintiffs and the Class are entitled to avoid and recover the transfer of monies from the Fraud Defendants and the Defendants' Entities to Hoffman as an actual or constructively fraudulent conveyance under Florida Statutes Chapter 726.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court:

a.    Certify this action as a class action under Fed. R. Civ. P. 23;

b.    Award Plaintiffs and the Class their damages, including pre-judgment interest, under each of the counts of this Complaint;

c.    Award Plaintiffs and the Class punitive damages;

d.    Award Plaintiffs and the Class their attorneys fees, costs, and expenses under each of the counts of this Complaint;

e.    Avoid the fraudulent transfers under Counts II and III of this Complaint; and

f.      Award Plaintiffs and the Class such other and further relief as is appropriate in the

interest of justice.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable as a matter of right.


Dated: June <u>17</u>, 2008.


                              Respectfully submitted,


                              s/Melanie E. Damian_____
                                   Fla. Bar No.:  0099392
                                   Mdamian@dvllp.com
                                   Kenneth D. Murena, P.A.
                                   Fla. Bar No.  147486
                                   Kmurena@dvllp.com
                                   Peter F. Valori
                                   Fla. Bar No. 43516
                                   Pvalori@dvllp.com
                                   Damian & Valori, LLP
                                   1000 Brickell Avenue, Suite 1020
                                   Miami, Florida  33131
                                   Telephone:    (305) 371-3060
                                   Facsimile:    (305) 371-3965


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 17, 2008, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or individuals on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                              s/Melanie E. Damian_____
                              Melanie E. Damian

## SERVICE LIST

*JERRY GUSTIN, ET AL. V. PAUL A. HOFFMAN, ET AL.*
Case No. 6:08-CV-57-ORL-22-DAB
UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA

Melanie E. Damian, Esq.
Email: mdamian@dvllp.com
Peter F. Valori, Esq.
Email: pvalori@dvllp.com
Kenneth Dante Murena, Esq.
Email: kmurena@dvllp.com
DAMIAN & VALORI, LLP
*Counsel for Plaintiffs, Jerry Gustin, et al.*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: 305.371.3960
Facsimile:  305.371.3965
*Service via transmission of Notices of
Electronic Filing generated by CM/ECF*

Scott Dimond, Esq.
Email: sdimond@dkrpa.com
Lorenz Michel Pruss, Esq.
Email:  lpruss@dkrpa.com
DIMOND KAPLAN & ROTHSTEIN, P.A.
2665 South Bayshore Drive, PH2-0B
Coconut Grove, Florida 33133
Telephone: 305.374.1920
Facsimile:  305.374.1961
*Service via transmission of Notices of
Electronic Filing generated by CM/ECF*

Anthony P. Strasius, Esq.
Email: anthony.strasius@wilsonelser.com
WILSON, ELSER, MOSKOWITZ,
EDELMAN    & DICKER, LLP
*Counsel for Defendant, Paul A. Hoffman*
100 Southeast 2nd Street, Suite 3800
Miami, Florida 33131
Telephone: 305.374.4400
Facsimile:  305.579.0261
*Service via transmission of Notices of
Electronic Filing generated by CM/ECF*

Edward J. Boyle, Esq.
Email: edward.boyle@wilsonelser.com
Jeffrey L. Wilson, Esq.
Email: jeffrey.wilson@wilsonelser.com
WILSON, ELSER, MOSKOWITZ,
EDELMAN    & DICKER, LLP
*Counsel for Defendant, Paul A. Hoffman*
150 East 42nd Street
New York, New York 10017-5639
Telephone: 212.490.3000
Facsimile:  212.490.3038
*Service via transmission of Notices of
Electronic Filing generated by CM/ECF*

William J. Kelly, Esq.
Email: william.kelly@wilsonelser.com
WILSON, ELSER, MOSKOWITZ,
EDELMAN    & DICKER, LLP
*Counsel for Defendant, Paul A. Hoffman*
3 Ganett Drive
White Plains, New York 10604-3407
Telephone: 914.323.7000
Facsimile:  914.323.7001
*Service via transmission of Notices of
Electronic Filing generated by CM/ECF*

Edward S. Digges, *Pro Se*
1 Sandy Acres
Cambridge, Maryland 21613
*Service via regular mail*

34

Richard C. Swank, Esq.
Email: rswank@litchfordchristopher.com
LITCHFORD & CHRISTOPHER, P.A.
*Counsel for Defendant, Katherine Kerr*
P.O. Box 1549
Orlando, Florida 32802-1549
Telephone:  407.422.6600
Facsimile:    407.841.0325
*Service via transmission of Notices of*
*Electronic Filing generated by CM/ECF*

Robert T. Shaffer, III, Esq.
Email: rshaffer@murphyshaffer.com
MURPHY & SHAFFER, LLC
*Counsel for Defendant, Katherine Kerr*
36 South Charles Street, Suite 1400
Baltimore, Maryland 21201
Telephone:  410.783-7000
Facsimile:    410.783.8823
*Service via transmission of Notices of*
*Electronic Filing generated by CM/ECF*