UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:08-CV-00057-GAP-DAB

JERRY GUSTIN, ELDA GARCIA,
and WESLEY WELLING, individually
and in their representative
capacity for all those similarly
situated,

Plaintiffs,

v.

PAUL A. HOFFMAN
and EDWARD S. DIGGES, JR.,

Defendants.

_____/

## FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jerry Gustin, Elda Garcia, and Wesley Welling, individually and in their representative capacity for all those similarly situated, sue Defendants Paul Hoffman ("Hoffman,") and Edward J. Digges, Jr. ("Digges"), for violations of Sections 10(b) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act").

### INTRODUCTION

1.     Plaintiffs bring this action against the Defendants for their violations of Sections 10(b) and 27 of the Exchange Act.  Plaintiffs' claims arise from a fraudulent securities scheme perpetrated by the Defendants by which hundreds of investors were defrauded out of approximately $22 million through investments in a group of corporate entities that Defendants owned or controlled.

2.     Specifically, Defendants used the following entities to defraud investors: Nexstar Communications, LLC ("Nexstar"), TMT Equipment Company, LLC; TMT Management Group,

CASE NO. 6:08-CV-00057-GAP-DAB

LLC ("TMT Management"); POSA, LLC ("POSA"), POSA TMT, LLC ("POSA TMT"); Camtucket LLC; Televest Communications, LLC; TMT International, LLC, Televest Group, LLC; KBK Partnership LLP; Chilham LLC; and Spin Drift, LLC (collectively, the "Defendants' Entities").

3.      Most of the Defendants' Entities are currently in receivership as a result of an action brought by the Securities and Exchange Commission on February 2, 2006, in the United States District Court for the Middle District of Florida, *SEC v. Digges, et al.*, Case No. 6:06-cv-137-Orl-19KRS (the "SEC Action"). *See* Order Granting Permanent Injunction, Freezing Assets, Appointing a Receiver and Ordering Other Ancillary Relief, SEC Action, (the "Order Appointing Receiver," [D.E. 15][1]).  With the filing of the SEC Action, the Securities and Exchange Commission ("SEC") exposed the Defendants' Entities' fraud.  On that day, the SEC filed a Complaint for Emergency Injunctive and Other Relief (the "SEC Complaint," SEC Action, D.E. 1), and the Court entered an Order granting the relief sought by the SEC Complaint.  *See* SEC Action, D.E. 7.

4.      It was only with the filing of the SEC Complaint that Plaintiffs and the Class became aware of the Defendants' Entities' fraud and uncovered the Defendants' role in perpetrating an investment fraud.

5.      The Order Appointing Receiver appointed James D. Silver, Esq. (the "Receiver") as the receiver of most of the Defendants' Entities.  The Receiver, on behalf of the Receivership estate, has sued Defendants for fraudulent transfer, breach of fiduciary duty, unjust enrichment, and improper shareholder distribution, all under Florida law, in a related proceeding currently pending

---

[1] Documents filed in the SEC Action shall be identified as follows: "SEC Action, D.E. *x*," where *x* is the docket entry number with respect to the SEC Action.

2

before this Court, *Silver v. Hoffman*, Case No. 6:07-cv-1670-Orl-31DAB.  If the Receiver recovers in the foregoing action, Plaintiffs, as creditors of the Receivership estate, may recover some portion of the losses they suffered at the hands of the Defendants as to the <u>Florida</u> claims.  Consequently, this lawsuit seeks to recover Plaintiffs' losses resulting from Defendants' violations only of federal securities laws.  More specifically, Plaintiffs seek recovery for violations of the Exchange Act.

6.     The Receiver's action does not seek recovery for violations of the Exchange Act, and the claims the Receiver <u>does</u> assert will not make the Plaintiffs whole for losses underlying the securities claims asserted herein.  *See* "Notice of Filing Statement by Receiver and Request for Status Conference" [D.E. 70] at ¶¶ 2, 3.

7.     The two Defendants have been long time business associates and personal friends. Defendant Hoffman was the best man in Defendant Digges's wedding.  Defendant Hoffman had a relatively distinguished reputation as a businessman for being, among other things, the Chairman and CEO of Ringler Associates, one of the nation's largest structured settlement firms.  Digges, on the other hand, was a disbarred attorney, who had served time in jail for committing fraud. According to Defendant Hoffman, in the past, he had lost significant sums of money in business enterprises with Defendant Digges.  The business enterprise the Defendants conducted through the Defendants' Entities essentially was supposed to pay back Defendant Hoffman for all of those losses.  Unfortunately, the Defendants ran the Defendants' Entities as a Ponzi scheme that bilked investors of some $22 million.

8.     Because the Defendants well understood that investors could be scared away from investing in the Defendants' Entities if they knew about the role of Defendant Digges, the

CASE NO. 6:08-CV-00057-GAP-DAB

Defendants actively concealed Defendant Digges's role and made Defendant Hoffman the figurehead for the enterprise. As a result, investors, brokers, and even government regulators were under the impression that Defendant Hoffman was at the helm of the Defendants' Entities when, instead, it was Defendant Digges who played the most active leadership role. As a result, the Defendants were able to amass millions in investments and skim millions for themselves and their family members.

9. The nature of the fraud was as follows. Between April 2003 and February 2006, the Defendants and the Defendants' Entities fraudulently sold securities in the form of investments in "point-of-sale" ATM terminals coupled with lease agreements. The terminals were supposed to be, and sometimes actually were, placed at retail establishments, and were used by merchants to provide customers with funds from customer credit, debit, ATM, or gift cards. The terminals were sold to investors by an entity controlled by the Defendants and leased back from the investors by another entity controlled by the Defendants. The investors were promised a fixed rate of return equivalent to twelve percent (12%) per year.

10. The Defendants' Entities, controlled by the Defendants, had been selling the terminals for $5,000 each, promising to pay the investors a twelve percent (12%) annual return for five years and offering to repurchase the terminals for the full $5,000 purchase price after five (5) years. The Defendants' Entities raised some $22 million from approximately 300 investors, many of whom are elderly. As detailed herein, the Defendants misrepresented that the lease payments were "assured," in part through a "reserve fund" that purportedly covered six months' worth of the monthly lease obligations. The Defendants' Entities also misrepresented that the program maintained a "sinking fund" to fund the eventual repurchase of the terminals. In addition, the

4

CASE NO. 6:08-CV-00057-GAP-DAB

Defendants concealed the role of Defendant Digges (a felon and disbarred attorney who had been convicted of fraudulent billing practices) in the ownership and control of the Defendants' Entities and, instead, touted Defendant Hoffman as the sole controller of the Defendants' Entities.

11.     In fact, the Defendants' program did not maintain any "sinking fund" or "reserve fund." Since June 2005, the Defendants' scheme ran a substantial monthly deficit. Thus, despite contracts with investors providing for the repurchase of terminals, the Defendants' Entities did not have assets with which to repurchase the terminals at the end of the five-year period.

12.     The Defendants also failed to disclose that, since April 2003, three state securities commissions issued orders finding that one or more of the Defendants' Entities violated state securities laws by offering the same securities at issue in this matter.

13.     During the course of the fraud, the Defendants' Entities sold the terminals through one or more of the following entities that they controlled or owned: Nexstar, TMT Management Group, and TMT Equipment Company, LLC, and leased the terminals back through POSA and POSA TMT, which they also owned or controlled.

14.     One or more of the Defendants' Entities were used to funnel investor funds to Katherine Kerr (the wife of Defendant Digges) to avoid making those funds available to the defrauded investor creditors of the Defendants' Entities.

15.     By virtue of this conduct, the Defendants' Entities violated Sections 10(b) & 27 of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, making the Defendants liable as control persons of the Defendants' Entities.

5

CASE NO. 6:08-CV-00057-GAP-DAB

## PARTIES

16.     Plaintiff Jerry Gustin is a citizen of the State of Texas who invested approximately $500,000 in the Defendants' Entities.

17.     Plaintiff Elda Garcia is a citizen of the State of Texas who invested approximately $30,000 in the Defendants' Entities.

18.     Plaintiff Wesley Welling is a citizen of the State of Florida who invested approximately $50,000 in the Defendants' Entities.

19.     Defendants Hoffman and Digges controlled the Defendants' Entities.  Promotional materials represented that Defendant Hoffman controlled various of the Defendants' Entities as an executive officer.  In fact, the Defendants both controlled those entities as owners and senior officers.  Defendant Digges is a resident of Maryland and Defendant Hoffman is a resident of New York.

20.     Defendant Hoffman received at least $625,000 in transfers from the Defendants' Entities which had the intended and actual effect of hindering the investors' claims against the Defendants and the Defendants' Entities.

21.     Defendant Digges and the Defendants' Entities are named as defendants in the SEC Action.

22.     Defendants were also named as defendants by the Receiver in actions ancillary to the SEC Action.

CASE NO. 6:08-CV-00057-GAP-DAB

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b).

24.     This Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida because: a) Defendants have engaged in significant business in Orange County, Florida; b) Defendants' wrongful conduct occurred in significant part in Orange County, Florida; and (c) Defendants and the Defendants' Entities were defendants in the SEC Action and/or in ancillary actions in the Middle District of Florida brought on claims related to those brought herein.

25.     Specifically, this Court has personal jurisdiction over Defendants Hoffman and Digges pursuant to § 48.193 of the Florida Statutes because Plaintiffs' cause of action arises out of Digges' and Hoffman's business activities through the Defendants' Entities and their sales agents in Florida.  Such activities evidence that Defendants Hoffman and Digges maintained the requisite minimum contacts with Florida so that exercising personal jurisdiction over them will not constitute a violation of their due process rights.

26.     During the relevant period, Defendant Digges created the investment scheme and organized and operated the Defendants' Entities.  And Defendant Hoffman had ownership in and served in an executive capacity with those Defendants' Entities.  Defendants' Entities represented to investors that Defendant Hoffman was the person in charge and used his reputation as a successful businessman to lure in funds from Florida residents as well as from other investors located all over the country, like Plaintiffs.  Defendant Hoffman has testified to having a significant ownership interest in all of the Defendants' Entities, which he claims were created by Defendant Digges.

7

Hoffman had continued ownership in the credit card terminal venture and ownership of Televest, the company at the top of Defendants' Entities umbrella organization.  Moreover, Defendant Hoffman's behavior with respect to the Defendants' Entities was not consistent with that of a passive investor.

27.    Indeed, Hoffman was so involved with Defendants' Entities that he was personally served with the cease and desist letter from the State of Pennsylvania for securities violations therein.  The State of Pennsylvania found that Defendant Hoffman and several of Defendants' Entities had violated certain provisions of the 1972 Act. The findings also provided that, as of November 17, 2003, Hoffman was the chairman and CEO of Nexstar and president of POSA, and Hoffman agreed to such findings.  Defendant Hoffman has also signed as CEO of Defendant Entity TMT International, LLC when he was setting up a bank account for the company at HSBC bank, serving as a signatory and using the address of his entity Ringler Associates.

28.    At around the same time, Defendant Hoffman received a K-1 from Spin Drift, LLC stating that he had been allocated over $1 million in profits and distributions and he received a transfer of $625,000 in April 2004 to cover the related tax liabilities.   And, as late as February 18, 2005, he represented himself as the chairman of Televest in answering an inquiry from a potential investor. The day before that communication, Hoffman had lent $75,000 to TMT Management Group.  Hoffman's actions were not that of a passive investor.

29.    In addition, while seeking investors, Defendants' Entities conducted substantial operations in Florida, including offering and selling securities in the Middle District of Florida. Defendant Hoffman has admitted knowledge that the terminals were being sold by Defendants' Entities in Florida, where they believed the case law was more favorable than that of other parts of

the country for permitting the sale leaseback of the credit card terminals.  In fact, Defendant Hoffman has claimed that the terminals only would be sold as an investment product where permitted by law and Hoffman asserted Florida law permitted such sales.  Thus, Defendant Hoffman knew he was conducting substantial business operations in Florida and he knew that people in Florida were receiving information marketing the sale of terminals as investment products. Therefore, Defendant Hoffman has the minimum contacts with the State of Florida required to apply Florida long-arm jurisdiction to him.

30.     Defendants, by operation of the Defendants' Entities, hired brokers and lured investors into their fraudulent scheme in various states, including Florida.  Their conduct in Florida is evidenced by Plaintiff Wesley Welling, a Florida resident, who was contacted by Defendants' agent, Gary A. Humesky, both in person and over the telephone to effectuate his investment in the Defendants' Entities. Mr. Welling was solely solicited by a Tampa-based Nexstar representative. All of the investment transactions were performed at Mr. Welling's home in Florida.  Moreover, Mr. Welling's purchase agreement contains a Florida Addendum to Millennium Terminal Purchase Agreement which provides Nexstar's Florida Business Opportunity Registration Number and a registered office and registered agent for Nexstar in Boca Raton, Florida.  Mr. Welling executed and returned the Addendum to Nexstar believing that he would have recourse against the entity and its principals in Florida.

31.     Various Plaintiffs received correspondence, agreements and certificates of title from Defendant Entities POSA TMT and TMT Management indicating an office in Orlando, Florida. According to promotional brochures marketing the investment scheme to Plaintiffs in various states, TMT Management was based and operated out of Orlando, Florida.  In fact, in the brochures,

CASE NO. 6:08-CV-00057-GAP-DAB

Plaintiffs were asked to contact an agent in Orlando, Florida to participate in the TMT Management program. And certain funds invested in Nexstar by Plaintiffs were deposited into Nexstar's Wachovia bank account in Orlando, Florida.

32.     Venue is also proper in this district pursuant to 28 U.S.C. §1391(c) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in and/or originated from the Middle District of Florida.

33.     Further, Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts, practices and courses of business set forth in this Complaint.

## GENERAL ALLEGATIONS

### The Defendants' Entities' Business Scheme

34.     From at least April 2003 through February 2006, the Defendants' Entities sold more than $22 million in investments in point-of-sale terminals to approximately 300 investors throughout the United States.

35.     Point-of-sale terminals were instruments typically placed at retail establishments, which merchants used to swipe customer credit, debit, ATM, or gift cards. The terminals verified whether a customer had sufficient available credit or funds to make a particular purchase.

36.     The Defendants' investments were marketed to investors, including Plaintiffs, through brokers who were provided promotional investment literature. The Defendants brandished the name of Defendant Hoffman on their promotional literature in order to provide credibility to the brokers and investors. And brokers and investors did in fact rely on the affiliation of Defendant Hoffman with the Defendants' Entities in promoting and purchasing the Defendants' investments.

10

37.     Defendant Hoffman also used his entity, Ringler Associates, to market the investment scheme.  His sales agents distributed literature about Ringler Associates as "the world's oldest and largest settlement annuity firm" to add credibility to the investments they were selling.  *See* Ringler Associates' website at www.ringlerassociates.com.  At least one such sales agent was listed as an employee of Ringler Financial Services, Inc. and this employment was used to convince investors to part with their funds and place them in the Defendants' Entities.  At the time of the investment scheme, Ringler Associates' website displayed Defendant Hoffman as its Chairman.  The literature also showed Ringler Associates as having offices "in principal cities nationwide", including eight offices in Florida, six of which are located in the Middle District of Florida.

38.     The investments were structured so that an investor purchased terminals from one of the Defendants' Entities for $5,000 and simultaneously entered into a leaseback agreement with another of Defendants' Entities.

39.     Under the leaseback agreement, the investors received monthly lease payments of $50 per terminal purchased, representing a twelve percent annual return, for five years.

40.     The Defendants represented that lease payments came from revenues generated whenever merchants used the terminals.  The lease payment to the particular investor was purportedly paid from the revenues of the leasing entity, and did not depend upon the performance of a particular terminal.  For example, Nexstar's literature represented that for every transaction a merchant processed through a Nexstar terminal, Nexstar would earn $.05 for every debit card transaction and $.025 for ever credit card transaction.  Investors have no role in the management of their terminal.  All managerial and functional responsibilities were handled by the entity leasing the terminal from the investors or others acting at the entity's behest.

11

41.     The lease arrangement obligated the Defendant's Entity leasing the terminal to repurchase the terminal for $5,000 at the end of the lease.  Under the various lease agreements, investors also had the right to have their terminals repurchased prior to the expiration of the five-year lease terms.  A number of investors actually sought to exercise their right to sell their terminals pursuant to these provisions; however, with respect to many of these investors, the Defendants' Entities did not fulfill its obligation to repurchase the terminals.

42.     Defendants had been selling these investments through a network of sales agents, principally insurance agents, financial planners, and certified public accountants, that stretched throughout the United States, but was primarily concentrated in Texas, California, Michigan, and Florida.

43.     That network was structured like a pyramid, with sales agents who sold the Defendants' investments directly to investors and other sales agents who had developed their own "downstream" network of sales agents.

44.     Investors in the Defendants' program paid total sales commissions ranging from twelve to eighteen percent of their total investment, which was then apportioned as compensation to sales agents "upstream" through the network.

45.     Between April 2003 and December 2003, the Defendants offered and sold the terminals through Nexstar, and used POSA to lease the terminals back from investors.

46.     During this period, investors were required to purchase a minimum of two terminals for $5,000 each.

47.     Upon payment of the funds, investors entered into three agreements: (i) a terminal purchase agreement between the investor and Nexstar; (ii) a lease agreement between the investor

CASE NO. 6:08-CV-00057-GAP-DAB

and POSA, requiring POSA to pay the investor $50 per month per terminal in exchange for placing, operating, and maintaining the terminal in a retail store; and (iii) an "option to sell agreement" that gave the investor the option to require POSA at the end of five years to repurchase the terminal from the investor for its full original purchase price of $5,000.

48.     Investors were given the option, and provided the forms, to purchase terminals in an Individual Retirement Account ("IRA") and, in the event that option was chosen, referred to a third-party IRA administrator located in California to service their account.

49.     Although investors also technically were given the option to buy and operate the terminals themselves, all of the investors leased the terminals to POSA in exchange for monthly lease payments.

50.     To promote sales of their investment program, the Defendants had marketing materials prepared that described the terminals and their program and arranged for presentations to sales agents at Nexstar's offices in Orlando, Florida.  The Defendants placed other marketing materials on a website.

51.     The Defendants also prepared and filed disclosure statements with the Federal Trade Commission ("FTC") and various state agencies.

52.     Along with their marketing materials, those disclosure statements, or portions of them, were provided to sales agents for their training and eventually used as promotional materials for investors.  Those statements represented, among other things, that Defendant Hoffman was Chairman and/or CEO of two of the Defendants' Entities that marketed to and received funds from investors, Nexstar Communications, LLC and TMT Management.

53.     On November 17, 2003, the state securities commissions of Maryland and

13

Pennsylvania issued against Nexstar and POSA certain Summary Orders to Cease and Desist ("Summary Orders") from offering and selling terminal investments in those respective states. From that point, in an attempt to avoid the technical restrictions of the Summary Orders, but certainly in violation of the spirit of those orders, the Defendants with full knowledge and intent to continue defrauding investors marketed the Defendants' Entities investments, primarily from Florida, using the same scheme that the Summary Orders sought to foreclose.

54. Thereafter, through the present, the Defendants continued to offer the same investment product, but began using TMT Management and later TMT Equipment to sell the terminals, and POSA TMT to leaseback the terminals from investors.

55. When the Defendants began selling terminals through TMT Management and TMT Equipment, they used Spin Drift and Televest Group to transfer funds among the various Defendants' Entities.

56. The Defendants also used Televest Group to fund lease payments to the investors and used Spin Drift to repurchase terminals from certain investors.

57. Despite using different entities, the Defendants' Entities' investment program remained essentially unchanged, except that the Defendants' Entities increased the minimum investment from two terminals to five.

### Defendant Hoffman's Ownership and Control over the Defendants' Entities

58. Defendant Hoffman testified that, prior to his involvement with the Defendants' Entities, Hoffman repeatedly lost money with respect to his business ventures with Defendant Digges. According to Hoffman, he was supposed to finally recoup those losses with this new scheme. Unfortunately, Hoffman's recoupment was to be accomplished through fraud.

CASE NO. 6:08-CV-00057-GAP-DAB

59.     The Defendants, Hoffman and Digges, essentially were 50-50 partners in the Defendants' Entities. Through a web of companies, the Defendants owned and controlled the Defendants' Entities.  Because Digges was a convicted felon, it would have been unwise to mention Digges's role in the ownership and management of the Defendants Entities.  Hoffman, on the other hand, had a relatively distinguished reputation as a businessman.  Consequently, the Defendants represented to investors and brokers that Hoffman was the person in charge of the Defendants' Entities, and concealed from investors the role that Digges played in management.

60.     Defendant Digges entered into a settlement with the SEC and the Receiver in connection with his ownership and control of the Defendants' Entities acknowledging Digges' involvement in the management of the Defendants' Entities.

61.     Defendant Hoffman claims that he was not involved in the management of the Defendants' Entities, but was merely a passive investor.  However, contrary to his claims, Hoffman: (i) was involved in and profited from the management of the Defendants' Entities, (ii) was aware, or should have been aware, that the Defendants' Entities were committing securities fraud with their investment products; and (iii) was in a position to stop the wrongful conduct being committed by the Defendants' Entities.

62.     Indeed, Hoffman not only allowed the Defendants' Entities to bilk investors, he was actively involved in promoting the Defendants' Entities' wrongful conduct.  What follows are specific examples of Hoffman's participation in the promotion of the wrongful conduct of the Defendants' Entities that are reflected in documents.

A.     <u>Defendant Hoffman Lured Investors</u>

15

CASE NO. 6:08-CV-00057-GAP-DAB

63.     Hoffman's name was prominently listed on the investment literature circulated by the Defendants' Entities.  That literature represented that Hoffman was in charge of certain key Defendants' Entities.  Defendant Hoffman's control of the Defendants' Entities was also touted by one or more web sites maintained by the Defendants' Entities.  In addition, Hoffman's control of the Defendants' Entities was touted by direct word of mouth to brokers and investors.

64.     Defendant Hoffman knew that his name was being used by the Defendants' Entities to market its products to investors.  Yet Hoffman took no meaningful steps to disassociate his name from the Defendants' Entities.  As a result, brokers solicited and investors invested funds in the Defendants' Entities in reliance on their belief that Hoffman was at the helm of the Defendants' Entities.

B.     <u>Defendant Hoffman Knew the Defendants' Entities Had Defrauded Investors</u>

65.     Defendant Hoffman not only was aware that the Defendants' Entities were using his name to market its products to investors, he also knew or should have known that the Defendants' Entities were perpetrating a fraud.  One reason Hoffman knew or should have known about the wrongful conduct of the Defendants' Entities is that he knew that Digges was convicted of and had served time in jail for fraud.

66.     Defendant Hoffman also had direct knowledge that the Defendants' Entities could not deliver on the promises they made to investors.  For example, Hoffman negotiated directly with a disgruntled investor of Nexstar Communications, LLC.  The investor claimed that he had been defrauded and Hoffman communicated with the investor and arranged for a refund of his investment into Nexstar Communications, LLC, in order to "get rid of him" as a "problem" for the Defendants' Entities.

16

67.     Hoffman received notice that two of the Defendants' Entities, Nexstar, POSA and Hoffman himself were cited by the Pennsylvania authorities for violating that state's securities laws. That same notice identified Hoffman as the "CEO" of Nexstar and POSA.  In settling the charges brought by the Pennsylvania authorities, Hoffman consented to the finding that he was chairman and CEO of Nexstar and purported president of POSA.

68.     Defendants' Entity TMT International LLC ("TMT International") was an entity owned and controlled by the Defendants.  Hoffman established a bank account for TMT International and in setting up the account, he listed himself as "CEO" of TMT International with the understanding that the entity was created as an additional vehicle to market the Defendants' investments overseas.

69.     The internal written correspondence of the Defendants' Entities indicate that Hoffman was involved in, and certainly aware of, the planning and operations of one or more of the Defendants' Entities.  That correspondence, which Hoffman himself received, repeatedly referred to Hoffman as the ultimate control person with respect to various of the Defendants' Entities.

C.      Defendant Hoffman Participated in the Management of the Defendants' Entities

70.     Hoffman actively engaged in the management of the Defendants' Entities by, among other things (including those activities identified above), participating in management conferences. According to a participant at one such conference, Hoffman himself suggested deepening the Defendants' Entities fraudulent conduct by using an already underfunded investor reserve fund (a fund that investors had been promised would be used to repurchase their terminals) to fund a new business enterprise.

D.       Defendant Hoffman Was Enriched by the Defendants' Entities

71.       According to his tax schedules, Hoffman received hundreds of thousands of dollars in profits as a result of his ownership interest in the Defendants' Entities.  At least $625,000 of Hoffman's returns came in the form of direct cash payments.

E.       Defendant Hoffman Had the Power to Stop the Fraud

72.       Because Hoffman, directly or indirectly, owned 50 percent of each of the Defendants' Entities, he had the power to stop, at any time, their fraudulent conduct.  Had Hoffman merely exercised his legal right to prevent the Defendants' Entities from engaging in conduct that defrauded investors.  Had Hoffman not acted with reckless disregard of the fraudulent conduct, he could have saved investors many millions of dollars.

73.       Because Hoffman owned and controlled the Defendants' Entities, he (like his cohort Digges) is liable for the misrepresentations and omissions of the Defendants' Entities.  Those misrepresentations and omissions are set forth in more detail in the following section.

**DEFENDANTS' ENTITIES' MISREPRESENTATIONS AND OMISSIONS**

**Misrepresenting the Existence of a Sinking Fund to Repurchase ATM Machines**

74.       The offering materials ("Offering Materials") prepared by the Defendants' Entities and distributed to the Defendants' Entities' sales force and investors represented that the lease payments were "assured."  In fact, since the inception, the investment program ran a deficit and did not have the assets to pay the promised lease payments or to repurchase the terminals.  The Defendants' Entities and Defendants themselves well understood that in fact lease payments were not "assured" and the Defendants' Entities did not have assets to pay the promised lease payments.

75.     Defendants' Entities' marketing materials represented that the obligations of POSA to pay monthly lease payments were "assured" through the creation of a "reserve fund." Specifically, the materials stated that "[t]o help insure that the monthly lease payments are available as due to our lessors, POSA maintains a six (6) month cash reserve fund for each and every lease it maintains."

76.     The Defendants' Entities also represented that they maintained a "reserve fund" or "sinking fund" to assure the repurchase of terminals. For example, in or around 2003, Digges told Christopher Morris, a sales agent, that the sinking fund for terminal repurchase was maintained at Fidelity Investments and, with each terminal purchase, funded with a $1,000 contribution from the Defendants' Entities and thereafter $75 per month during the term of the five-year lease.  That was a lie and the Defendants' Entities knew it was a lie.  No such fund at Fidelity Investments was ever maintained by the Defendants' Entities, nor was there a fund anywhere that was maintained with such contributions from the Defendants' Entities.

77.     The Defendants' Entities through Digges and Chris Haug also told a group of sales agents at sales agents' meetings in Orlando, Florida  that the Defendants' Entities maintained a reserve fund, which was invested in federal government treasury obligations.

78.     In addition, Chris Haug, the chief financial officer of Nexstar, represented in a January 29, 2004 letter to Jack Brown, another sales agent selling Defendants' investment program, that a reserve fund would be maintained.   Again, that was a lie.  No such reserve fund ever was maintained.

CASE NO. 6:08-CV-00057-GAP-DAB

79.     In truth, the Defendants' Entities never established a reserve fund or sinking fund to cover the lease payments or the repurchase of terminals. And instead, Defendants misled investors for the sole purpose of generating profits solely for Defendants' benefit.

**Misrepresentations and Omissions Related to Management Experience and Integrity**

80.     Defendants' Entities' Offering Materials also touted the experience, expertise, and integrity of management, representing that, within the previous seven years, management had no criminal or civil liability involving fraud.  This was another of the Defendants' Entities' lies.

81.     The Offering Materials distributed by the Defendants' Entities prominently mentioned Hoffman, but intentionally concealed Digges' substantial and controlling role in the program and did not disclose Digges' 1990 mail fraud conviction, which arose from client over-billing.

82.     Defendants' Entities' Offering Materials also intentionally failed to disclose the 1989 civil judgment against Digges for fraud, deceit, and breach of contract.  That judgment ordered Defendant Digges and his law firm, jointly and severally, to pay $3,634,801.92.

83.     Nor do the Offering Materials disclose that Digges, formerly a lawyer licensed in Maryland, was disbarred following his felony conviction.  Defendant Hoffman knew of Digges' conviction and knew that the conviction was intentionally withheld from the Defendants' Entities' Offering Materials.

84.     After the Summary Orders were issued by the Maryland and Pennsylvania securities commissions, the Defendants' Entities also failed to disclose that the Defendants had been specifically cited for violating securities laws in connection with the exact same investment product they were then marketing.  The Summary Order from Maryland found that the Defendants had

CASE NO. 6:08-CV-00057-GAP-DAB

committed fraud which, likewise, was never disclosed to investors.  The Defendants were both well aware of the Summary Orders and both intentionally withheld the disclosure of them from investors.

85.    All of those misrepresentations and omissions constituted fraud and were made for the sole purpose of generating profits for the benefit of the Defendants.

### The Defendants' Entities Were Operated as a Ponzi Scheme

86.    The Defendants' Entities began operating at a deficit at or near their inception in November 2002, and the deficit widened as time progressed, reaching at least $140,000 per month by the first quarter of 2005.  Both of the Defendants were well aware of the financial condition of the Defendants' Entities – which they owned – and both intentionally failed to disclose this financial condition to investors.

87.    Those deficits arose because the revenue from terminals that were actually placed with merchants, referred to as "residual payments," were minimal compared to: (a) the lease obligations to investors; and (b) the substantial amount of investor proceeds that Defendants regularly transferred to or for the benefit of themselves or their family members.  Again, both Defendants were well aware that the actual residual payments did not cover the Defendants' Entities' lease obligations to the investors.  The Defendants' Entities were run at a constant operational deficit so that lease payments could be made only from the payments from investors.

88.    Because the Defendants' Entities that had contracted to lease and repurchase the credit card terminals from investors did not have sufficient funds to cover their obligations, the Defendants operated the Defendants' Entities as a Ponzi scheme, directing the Defendants' Entities to use funds from new investors to pay the Defendants Entities' lease and repurchase obligations.

89.     Even though the Defendants' Entities and Defendants themselves knew full well that the Defendants' entities were being run as a Ponzi scheme, investors were never told that the Defendants' Entities operated as a Ponzi scheme.

90.     Investors were intentionally misled for the sole purpose generating profits for the benefit of the Defendants.

### Defendants Concealed the State Summary Orders

91.     The Defendants and the Defendants' Entities intentionally misled state securities regulators in Maryland by misrepresenting that they had ceased selling their ATM investments to investors.  The investigations of the Receiver revealed emails and other correspondence and documents showing that after being served the Summary Orders from Maryland state securities regulators, Defendants and the Defendants' Entities continued operating the exact same ATM investment business through different Defendants' Entities.  This was an intentional misrepresentation by Defendants and the Defendants' Entities to securities regulators.  Defendants and the Defendants' Entities also intentionally and misleadingly withheld from their investors, including Plaintiffs, that: (i) they had received the Maryland and the Pennsylvania Summary Orders; and (ii) their deceptive scheme to continue the exact same practices that the cease and desist orders were intended to foreclose.

92.     Specifically, after December 2003, investors were not told, through the Offering Materials or otherwise, that the state securities commissions of Maryland and Pennsylvania had issued those Summary Orders finding that one or more of Defendants' Entities had violated state securities laws by engaging in the offering.

93.     Investors also were not told that, in October 2004, the state securities commission of Ohio issued an order finding that one or more Defendants' Entities had violated Ohio's securities laws by engaging in the offering.  This information was purposefully withheld from investors by Defendants and the Defendants' Entities.

94.     The Defendants did not disclose that the Maryland Summary Order included a finding that the offering involved fraud.  This information was purposefully withheld from investors by Defendants and the Defendants' Entities for the purpose of generating profits for the benefit of the Defendants.

### Defendants Concealed Commissions and Payments to Insiders

95.     Prospective investors also were not advised, through the Offering Materials or otherwise, of the existence or the magnitude of the sales commissions that investors were paying to sales agents on terminal investments, *i.e*., twelve to eighteen percent of their total invested funds.

96.     Defendants also were paid huge sums by the Defendants' Entities and those amounts were not disclosed.

97.     Defendant Hoffman received cash directly from the Defendants' Entities.  Indeed, Plaintiffs are aware of at least one instance when Defendant Hoffman received such a cash payment. In April 2004, Defendant Hoffman received $625,000 from the Defendants' Entities.  At the time the transfer was made to Hoffman, the Defendants' Entities were completely insolvent.

### ALLEGATIONS AS TO PLAINTIFFS

#### Individual allegations regarding Jerry Gustin

98.     In reliance on the misrepresentations and omissions of the Defendants' Entities, Plaintiff Jerry Gustin invested $500,000 in the Defendants' Entities.

99.     In or about  March 2003, an agent of the Defendants' Entities, George Elliot, visited Mr. Gustin and made the following material misrepresentations regarding the Defendants' Entities' investments:

(i)     that the Defendants' Entities were primarily owned and chiefly operated by Defendant Hoffman, who was a respected businessman with a record of being the CEO of a large company traded on the New York Stock Exchange;

(ii)     that the Defendants' Entities' investments were a legitimate business opportunity and would result in Mr. Gustin enjoying returns from the income of ATM terminals of 12% per year or 1% per month;

(iii)     for every $5000 that Mr. Gustin invested in the Defendants' Entities to purchase an ATM machine, he would receive $50.00 in income from the terminal and then could sell the terminal back to the Defendants' Entities after owning the terminals for three years; and

(iv)     that the Defendants' Entities maintained a reserve fund to repurchase terminals in case he chose to sell his terminals at the end of three years.

100.    All of those representations were false and Mr. Gustin relied on those statements when he made the decision to spend $500,000 to purchase twenty (40) terminals and an investment stake in a company that was to engage in the same ATM machine business but pay an even higher return to Mr. Gustin. Furthermore, Mr. Gustin understood that Mr. Elliot had made such misrepresentations on behalf of Defendants and Defendants' Entities. In fact, this understanding was well founded. The misrepresentations originally were made by the Defendants' Entities to Mr. Elliot and other sales agents via telephone conferences and at conferences held at the offices of the Defendants' Entities in Orange County, Florida so that those agents, including Mr. Elliot, would pass along the misinformation to investors.

101.    In particular, Mr. Gustin first invested $100,000 in August 2003 to purchase and lease back twenty ATM machines from the Defendants' Entities. Mr. Gustin received monthly payments consistent with his investment contract that required a twelve percent annual return. In February 2004, Mr. Gustin invested another $100,000 into the Defendants' Entities for another twenty machines. Again, he was paid consistent with his investment contract.

102.    In December 2005, Mr. Gustin liquidated a substantial portion of his retirement savings in order to purchase yet another sixty machines for an additional $300,000. And this was at a time that the Defendants well understood that the Defendants' Entities were not only operating a Ponzi scheme, but operating a Ponzi scheme that was flat broke. By this time, the Defendants' Entities already were bouncing checks written to their other investors, yet still they took $300,000 from Mr. Gustin, thereby increasing Mr. Gustin's investment by 150 percent into the Defendants' obviously failed enterprise. All of those investments were made in reliance on the misrepresentations of the Defendants' Entities' agent, George Elliot.

CASE NO. 6:08-CV-00057-GAP-DAB

103.    In addition, Mr. Gustin reviewed and executed investment documents (the "Gustin Documents"), redacted and attached hereto as **Composite Exhibit "A"**, that were prepared by the Defendants' Entities and that reflected the terms represented by Mr. Elliot to Mr. Hoffman.  The Gustin Documents contained the following material misrepresentations:

(i)    that the Defendants' Entities were a legitimate business enterprise that was generating investment income from the fees charged by its ATM machines;

(ii)    that the Defendant Entities' investments would provide a return of 12% per year to Mr. Gustin; and

(iii)    that Mr. Gustin would be able to sell his ATM machines back to the Defendants' Entities after three years of owning the ATM machines for the price he had paid to purchase them from the Defendants' Entities.

104.    Mr. Gustin relied on all of those material misrepresentations each time he invested in the Defendants' Entities.

105.    Soon after their final investment into the Defendants' Entities, the monthly checks stopped coming in and Mr. Gustin made pleas directly to the Defendants for the return of his investments.

106.    Like the other Plaintiffs, Mr. Gustin relied on the misrepresentations and omissions of the Defendants and the Defendants' Entities in investing into the Defendants' Entities.  As a result, he lost approximately $500,000, the lion's share of his retirement nest egg.

**Individual allegations regarding Elda Garcia**

107.    Plaintiff Elda Garcia is an elderly, handicapped widow, with no survivor pension benefits whatsoever, who lives in San Antonio, Texas.  Through Defendants' Entities' agent, Ms.

26

Garcia was persuaded to purchase and lease-back six ATM machines from the Defendants' Entities in reliance on Defendants' Entities' various misrepresentations and omissions, for a total investment of $30,000.

108.     In or about April 2004, Plaintiff Elda Garcia was solicited by an agent of the Defendants' Entities, Frank Harrison, of Harrison Insurance Services in San Antonio, Texas.  Ms. Garcia was told by Mr. Harrison, in particular, that she would be paid a 12% annual return on her investment into the Defendants' Entities and that she would be able to sell her investment back to the Defendants' Entities after three years.  Ms. Garcia was presented with lease documents (the "Garcia Documents"), redacted and attached hereto as **Composite Exhibit "B"**, that confirmed the return that she was promised by Mr. Harrison.  Ms. Garcia understood that Mr. Harrison had made the above misrepresentations on behalf of Defendants and Defendants' Entities. In fact, this understanding was well-founded.  The misrepresentations were made originally by the Defendants' Entities to Harrison and other sales agents via telephone conferences and at conferences held at the offices of the Defendants' Entities in Orange County, Florida so that those agents, including Mr. Harrison, would pass along the misinformation to investors.

109.     The Garcia Documents included the following material misrepresentations:

(i)      that the Defendants' Entities were a legitimate business enterprise that would generate investment income from the fees charged by its ATM machines;

(ii)     that the Defendants' Entities' investments would provide a return of 12% per year to Ms. Garcia; and

(iii)    that Ms. Garica would be able to sell their ATM machines back to the Defendants' Entities after three years of owning the ATM machines for the price they paid to purchase them from

CASE NO. 6:08-CV-00057-GAP-DAB

the Defendants' Entities.

110.   All of these representations were false and relied on by Ms. Garcia when she made the decision to spend $30,000 to purchase six (6) terminals in April 2004.

111.   The investment of $30,000 amounted to nearly all of Ms. Garcia's investment savings.  She had hoped it would provide her with a little extra income to supplement her social security benefits.  Unfortunately, she fell victim to the Defendants' investment fraud and, instead, lost all of her savings.

112.   For several months following her investment, Ms. Garcia received monthly payments of $300 that supposedly represented revenues generated from the operation of the ATM machines she had purchased from and leased back to Defendants' Entities.

113.   Then, those payments ceased, and while Ms. Garcia desperately attempted to recover her $30,000 investment, she was not able to recoup any of her investment from the Defendants' Entities.

114.   When Ms. Garcia wrote to the senior managers of the Defendants' Entities to plea for the return of her investment, she sent the letter to Defendant Hoffman believing that he was the senior officer in control.  Because of the misrepresentations and omissions of the Defendants and the Defendants' Entities, Ms. Garcia has lost all of her retirement investment capital.

**Individual allegations regarding Wesley Welling**

115.   Wesley Welling similarly was lured into investing $50,000 in the Defendants' Entities.  In or about October 2003, Mr. Welling reviewed an advertisement that had been placed in an Orlando, Florida newspaper by an agent selling the Defendants' Entities' investments.  The advertisement indicated that investors would receive a return of 12% per year on their investments.

28

CASE NO. 6:08-CV-00057-GAP-DAB

116.    Mr. Welling then contacted an agent of the Defendants' Entities, whose name was Gary A. Humesky.  Mr. Humesky provided Mr. Welling with promotional materials touting the Defendant Entities' investments as providing a fixed return of $50.00 per month for every $5,000 invested for the purchase of an ATM machine.  The promotional materials also stated that the investor had the right to sell back the ATM machine after two years for the price paid.  The attached "POSA Terminal Equipment Lease Agreement" provided by Mr. Humesky to Mr. Welling confirmed those terms. *See* Exhibit C.  Attached to the Lease Agreement was an "Option to Sell Agreement" stating that the investor would have the right to sell back any ATM machines to the Defendants' Entities for $5000, the same price paid by the investor for each terminal.  *See* Exhibit C.  The letter from Mr. Humesky summarizing the Defendants' Entities' investment offering, and the Defendants' Entities' executed documents memorializing the terms of the investment offering presented to Mr. Welling (the "Welling Documents"), are redacted and attached hereto as **Composite Exhibit "C"**.

117.    The material misrepresentations in the Welling Documents include the following:

(i)      that the Defendants' Entities were a legitimate business enterprise that was generating investment income from the fees charged by its ATM machines;

(ii)     that the Defendant Entities' investments would provide a return of 12% per year to Mr. Welling; and

(iii)    that Mr. Welling would be able to sell their ATM machines back to the Defendants' Entities after three years of owning the ATM machines for the price they paid to purchase them from the Defendants' Entities

118.    All of those representations were false, and Mr. Welling relied on those statements

when he made the decision to spend $50,000 to purchase twenty (10) ATM machines shortly after his meeting with Humesky and his review of the Welling Documents.

### The potential class plaintiffs are similarly situated

119.    The other potential class plaintiffs are similarly situated to Ms. Garcia, Mr. Gustin, and Mr. Welling, in that they generally invested some or all of their life savings with the Defendants' Entities in reliance on Defendants' Entities' agents, who promised a guaranteed return and ensured no possibility of loss on the investment.  In support of a common scheme of deception, Defendants and Defendants' Entities made uniform misrepresentations concerning the operations, efficacy, and profitability of the scheme through uniform offering materials and advertising materials that were furnished to each putative Class member.  That is, in deciding to invest in the scheme, each putative Class member received the <u>same</u> misrepresentations by Defendants and Defendants' Entities, reflected in the offering materials and advertising.  Those potential plaintiffs are now living without savings and many are elderly and/or handicapped and without the ability to seek employment.

120.    Thus, with respect to each of the potential class members, the Defendants' and their agents' misrepresentations, omissions and fraud caused the potential class members to invest into the Defendants' Entities thereby resulting in the loss of millions of dollars.

### CLASS ACTION ALLEGATIONS

121.    Plaintiffs bring this action as a class action against Defendants pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased, sold, held, and/or retained investments in the Defendants' Entities between April 2003 and February 2006 (the "Class").  Excluded from the Class are Defendants and all of their respective

CASE NO. 6:08-CV-00057-GAP-DAB

employees, agents, family members, legal representatives, heirs, subsidiaries, affiliates (including the Defendants' Entities), successors, or assigns.

## Requirements of Fed. R. Civ. P. 23(a)(1-4)

### Numerosity

122.    The individual class members are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes approximately 300 investors residing throughout the United States.  While some of the Class reside in Florida, members of the Class are so numerous and geographically dispersed throughout the United States and abroad that joinder of all Class members is not feasible.  Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

### Commonality

123.    There are questions of law and fact that are common to the claims of Plaintiffs and the entire Class.  Among those common questions are the following:

      a.    Whether the Defendants were control persons under the Exchange Act and/or part of the fraudulent scheme;

      b.    Whether the Defendants and the Defendants' Entities knowingly made material misrepresentations or omissions; and

      c.    Whether the Plaintiffs were damaged by the Defendants' course of conduct.

### Typicality

124.    Plaintiffs' claims are typical of the claims of the Class members and all Class members sustained damages arising out of the Defendants' wrongful conduct in violation of federal securities laws complained of herein.

31

125.    Upon information and belief, there has never been a prior lawsuit certified as a class action on behalf of Plaintiffs or the Class.

### Adequacy of Representation

126.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous persecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members.

127.    To prosecute this case, Plaintiffs retained the law firms of Damian & Valori, LLP, Dimond Kaplan & Rothstein, P.A., and Wadsworth Huott LLP, which are experienced in class action litigation, including class actions dealing with fraud and professional misconduct.  The law firms have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### Requirements of Fed. R. Civ. P. 23(b)(3)

### Predominance

128.    The questions of law or fact common to the claims of Plaintiffs and of each Class member predominate over any questions of law or fact affecting only individual members of the Class.  Reliance is presumed or proven on a class-wide basis, for three reasons:

> (1)    All claims by Plaintiffs and the unnamed Class members involve overarching omissions, affecting the entire Class, including each Defendant's uniform omissions by failing to disclose: (a) that no promised sinking fund was being maintained to repurchase ATM machines from investors; (b) Defendant Digges' involvement in the scheme and his involvement in past criminal

CASE NO. 6:08-CV-00057-GAP-DAB

activity; (c) that the Defendants' Entities were being operated as a Ponzi

scheme; (d) that state regulators found that the investment product marketed

by the Defendants through the Defendants' Entities was an unregistered

security; and (e) that Defendants and other insiders received large unearned

payments from investor proceeds;

(2)     All claims by Plaintiffs and the unnamed Class members are based on the

same alleged "across the board" conduct by the Defendants in a common

fraudulent scheme of inducing them to purchase unregistered securities, to

handle their retirement investments, and to retain their investments at

Defendants' Entities, by misrepresenting: (a) a fixed rate of return of twelve

percent (12%); (b) assured lease payments based on a nonexistent "reserve

fund"; (c) the existence of a "sinking fund" to fund the eventual repurchase

of the terminals; (d) the extent of Defendant Hoffman's involvement in the

Defendants' Entities; and (e) the overall operations, efficacy, and

profitability of the scheme through uniform offering materials and

advertising materials furnished to each putative Class member; and

(3)     The Defendants' Entities' securities were not traded on the open market, and

could not have been offered on the market at any price but for the fraudulent

scheme in which the Defendants participated.

129.    Common issues predominate when, as here, liability can be determined on a

class-wide basis, even when there will be some individualized damage determinations.  As a result,

when determining whether common questions predominate, courts focus on the liability issue, and

if the liability issue is common to the class as in the case at bar, common questions are held to predominate over individual questions.

130.    Moreover, because Plaintiffs here allege the existence of a ponzi scheme, they have sufficiently alleged a common course of fraudulent conduct to satisfy the predominance requirement.

131.    In sum, the predominance requirement of Fed.R.Civ.P. 23(b)(3) is satisfied because all claims by Plaintiffs and the unnamed Class members are based on the same alleged "across the board" wrongful conduct of Defendants.

### Superiority

132.    A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

  a.  Joinder of all Class members would create extreme hardship and inconvenience for the affected investors (many of whom are elderly) because of their wide geographical dispersion.  Many class members reside outside of the state of Florida;

  b.  Individual claims by the Class members are impractical because the costs to pursue individual claims could exceed the value of what any one Class members has at stake.  As a result, many individual Class members have no interest in or ability of prosecuting and controlling separate actions;

  c.  The interests of justice will be best served by resolving the common disputes of potential Class members in one forum;

CASE NO. 6:08-CV-00057-GAP-DAB

    d.      Individual suits would not be cost effective, especially in light of the fact that the Class members are citizens of a number of different states and some are foreign nationals; and

    f.      The action is manageable as a class action; individual lawsuits may not be economically maintainable as individual actions.

**COUNT I**
**Violations of Section 10(b) of the Securities Exchange Act of 1934**
**and Rule 10b-5, Control Persons Liability**

133.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 132 as though fully set forth herein.

134.    Between 2003 and 2006, Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities described herein, have knowingly: (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material facts and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which have operated as a fraud upon the purchasers of such securities.

135.    As stated in greater detail *inter alia*, Defendants carried out their scheme and made untrue statements of material facts, and omitted to state material facts, with actual knowledge of the materially misleading nature of the scheme and the misrepresentations and omissions.  Specifically, Defendants intentionally concealed or misrepresented facts relating to: Digges' involvement in the Defendants' Entities; Digges' fraud conviction and misdeeds leading to his disbarment; the existence of a reserve fund; the issuance of Summary Orders by Maryland and Pennsylvania finding fraud in

CASE NO. 6:08-CV-00057-GAP-DAB

Defendants' operations; the operation of the Defendants' Entities as the same scheme that the Summary Orders intended to foreclose; the operation of the Defendants' Entities as a Ponzi scheme; and the huge commissions and payments to insiders of the Defendants' Entities.

136.    Plaintiffs and Class members have been damaged by the conduct of Defendants and the Defendants' Entities as alleged herein.  Defendants and the Defendants' Entities intentionally made their misrepresentations, knowing they were false and with specific intent of causing the Defendants' Entities' investors, including Plaintiffs, to rely on those misstatements.  Indeed, that the Defendants' Entities were run as a Ponzi scheme made practically every material statement the Defendants' Entities made to investors, whether directly to investors, through their documents or through sales agents, material misrepresentations. As more specifically set forth above, Defendants relied on those material misrepresentations to their detriment by investing with the Defendants' Entities.

137.    As specifically alleged above Defendants were, directly or indirectly, control persons of the Defendants' Entities for purpose of Section 20 of the Exchange Act, 15 U.S.C. §78t(a), in that they exercised and had actual control over the Defendants' Entities' corporate policy and general affairs, including the content of public statements disseminated by the Defendants' Entities.

138.    The Defendants' Entities violated Section 10(b) of the Exchange Act and rule 10b-5 thereunder.

139.    As control persons of the Defendants' Entities, Defendants are jointly and severally liable with and to the sae extent as the Defendants' Entities for their violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

CASE NO. 6:08-CV-00057-GAP-DAB

140.    As a direct and proximate result of the conduct alleged herein, Plaintiffs and the Class have suffered damages in connection with their investments with the Defendants' Entities.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court:

a.    Certify this action as a class action under Fed. R. Civ. P. 23;

b.    Award Plaintiffs and the Class their damages, including pre-judgment interest;

c.    Award Plaintiffs and the Class punitive damages;

d.    Award Plaintiffs and the Class their attorneys fees, costs, and expenses; and

e.    Award Plaintiffs and the Class such other and further relief as is appropriate in the interest of justice.

CASE NO. 6:08-CV-00057-GAP-DAB

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable as a matter of right.

Dated: December 5th, 2008.

Miami, Florida.

Respectfully submitted,

s/Melanie E. Damian                    Scott M. Dimond, Esq.
Fla. Bar No.:  0099392                 Fla. Bar No.:  995762
Mdamian@dvllp.com                      sdimond@dkrpa.com
Peter F. Valori                        Dimond Kaplan & Rothstein, P.A.
Fla. Bar No. 43516                     Office at Grand Bay Plaza
Pvalori@dvllp.com                      2665 South Bayshore Drive, Penthouse 2B
Damian & Valori, LLP                   Miami, Florida 33133
1000 Brickell Avenue, Suite 1020       Telephone: (305) 374.1920
Miami, Florida  33131                  Facsimile:  (305) 374.1961
Telephone: (305) 371-3060
Facsimile:  (305) 371-3965


Guy F. Giberson
Fla Bar No.: 627402
gfg@wadsworth-law.com
Wadsworth Huott LLP
200 SE 1st Street, Suite 1100
Miami, Florida 33131
Telephone:  (305) 777-1000
Facsimile:  (305) 777-1001

38